In re Richard A. **HULTQUIST** and Carolyn Hultquist, Debtors.

**ALEXANDER & ALEXANDER OF WASHINGTON, INC.,** Plaintiff/Appellee & Cross Appellant,

v.

Richard A. **HULTQUIST** and Carolyn Hultquist, Defendants/Appellants & Cross Appellees.

**BAP Nos. WW 88–1262, 88–1286. Bankruptcy No. 86–09245. Adv. No. A87–02407.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted March 16, 1989.

Decided June 27, 1989.

Charles L. Meyer and Weckworth, Baker & Meyer, Seattle, Wash., for defendants/appellants and cross appellees.

Sarah Barian Yates and Davis, Wright & Jones, Seattle, Wash., for plaintiff/appellee and cross appellant.

Before MOOREMAN, MEYERS and JONES, Bankruptcy Judges.

MOOREMAN, Bankruptcy Judge:

Both of the instant appeals arise out of the same adversary proceeding in which Alexander & Alexander of Washington, Inc., ("A & A"), sought to have certain claims against Mr. Hultquist ("debtor"), held nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4).[1]

## FACTS

### BAP No. WW 88–1262

The undisputed facts essential to appeal # WW 88–1262 are summarized as follows. In 1984, the debtor managed the Executive Planning Services Department for A & A ("EPS"), in the Seattle and Anchorage markets. In this regard, the debtor was engaged almost exclusively in the sale of life insurance policies. Although a Mr. Spence as Managing Vice President of A & A in Seattle "loosely supervised" the debtor's operational matters, by written agreement, the debtor's EPS department was "autonomous." Pursuant to the written agreements, the debtor was eligible for a substantial bonus if his business levels indicated successful production levels within a calendar year. In determining a year's "production level," EPS Department heads were allowed to "pre-bill" certain life insurance income. Pre-billing at A & A is a procedure through which an insurance broker places on its books credit for commissions earned, but not yet paid by the individual insurance company, and policies that had been sold during a calendar year. The National Director of EPS Operations sent a memo to EPS Department heads which established that pre-billing was appropriate only if: 1–all of the underwriting had been completed; 2–policies had been issued acceptable to the client; 3–all premiums had been paid by the client on which commissions would be pre-billed; and 4–the entire pre-billed commission would be received

---

**1.** Because these appeals arise out of similar facts and circumstances and because the parties have combined both appeals in their briefs, these appeals are hereby consolidated for purposes of this disposition.

from the insurance company in the following month, or within 30 days.

In late 1984, the debtor sought to "pre-bill" a certain $5,000,000 policy [2] for a Neiso Moscatel ("the Moscatel policy"). However, at the time the pre-billing occurred, Mr. Moscatel had not paid a premium and the underwriting had not been completed pursuant to the pre-billing requirements. In response to an accounting request for commissions on the pre-billed accounts, the debtor signed a statement in January 1985, wherein it was represented to the regional supervisor that the Moscatel policy premiums had been paid and the policy issued. This statement, however, was false.

Also in January 1985, the debtor obtained a "commission advance" for A & A from Philadelphia Life Insurance Co. in an amount equivalent to the commission on the $5 million policy or approximately $58,000. In order to obtain the advance, however, the debtor was required to sign a note in his capacity as a Vice President of A & A, binding A & A with respect to the $58,000. This procedure was not uncommon and was an accepted policy of A & A. A notation on the $58,000 check to A & A stated, "commission advance" and although it appears that the debtor delivered the check to A & A through Mr. Spence, A & A apparently did not discover the fact that the funds were an advance or loan.

After the $58,000 "commission advance" appeared on A & A's records as a receivable, the debtor received the appropriate credit on his 1984 production level and as a result received from A & A a $24,000 bonus. In addition, A & A also contends that the debtor received a $7,000 salary increase solely as a result of the apparent earned commission on the Moscatel policy.

After receiving the complete application on the Moscatel policy in March 1985, Phil-adelphia Life did not issue the $5,000,000 policy, but issued a "reduced" policy of $1,000,000 Universal Life and $2,000,000 in term insurance.[3] Accordingly, the commission actually earned by A & A at that time was approximately $28,000 and not the $58,000. Although the debtor was aware of the reduced commission, he did not inform his supervisors.[4]

In early 1986, A & A became aware that the debtor had signed a note for the $58,000 advance commission, rather than actually receiving the money as an earned commission.

Upon filing the debtor's Chapter 7 bankruptcy, A & A filed a complaint seeking to have the debt determined nondischargeable pursuant to § 523(a)(2)(A). After a three day trial on the matter, the bankruptcy court determined that A & A had established by clear and convincing evidence that the debtor had made false representations with the intent that A & A rely on the misrepresentations, that such representations were relied on by A & A in paying the debtor a $24,400 bonus and $7,000 salary increase, and A & A was thereby damaged accordingly. Pursuant to the above conclusions, the bankruptcy court entered a judgment of nondischargeability in favor of A & A in the amount of $31,400 pursuant to § 523(a)(2)(A). From this judgment, the debtor filed a notice of appeal. (BAP No. WW 88–1262).

### BAP No. WW 88–1286

In the related cross appeal, A & A also sought the nondischargeability of a claim against the debtor for an approximate $20,000 commission which the debtor apparently received as a result of a separate policy sold to a Bill Allen. In late 1985, A & A apparently was in the process of closing the Seattle EPS Department, which the debtor managed. While still employed by

---

**2.** This policy as originally hoped, was broken down into $3,000,000 of Universal Life and $2,000,000 in term insurance.

**3.** There is conflicting evidence in the record as to whether the "reduction" in the proposed coverage was a result of Mr. Moscatel's desires or whether Philadelphia Life determined not to issue the policy for the original amount.

**4.** If the debtor would have received credit for the corrected commission amount (approximately $28,000), on his "true 1984 production totals," the debtor would then apparently been entitled to only a $400 bonus.

A & A, the debtor sold a life insurance policy to Mr. Allen on behalf of the debtor's personal corporation, R.A. Hultquist, Inc., and personally received the $20,000 commission.

Based on this transaction, A & A also sought the nondischargeability of its $20,-000 claim against the debtor pursuant to § 523(a)(4) arising from the alleged breach of fiduciary duty. Upon the debtor's Motion for Summary Judgment, the bankruptcy court determined that as a matter of law, the undisputed facts did not support a claim for a § 523(a)(4) cause-of-action and this portion of the nondischargeability complaint was dismissed. From this Summary Judgment, A & A filed the cross appeal. (BAP No. WW 88–1286).

## DISCUSSION

### BAP No. WW 88–1262

This Panel reviews the bankruptcy court's findings of fact under a "clearly erroneous" standard, while conclusions of law are reviewed *de novo.* *E.g.* Bankruptcy Rule 8013; *Anderson v. City of Bessemer,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

It is generally recognized that in order for a creditor to have a debt declared nondischargeable pursuant to § 523(a)(2)(A),[5] it must satisfy by "clear and convincing evidence" that:

1—the debtor made the representations;

.2—at the time he knew they were false;

3—he made them with the intention and purpose of deceiving the creditor;

4—the creditor relied on such representations; and

5—the creditor sustained the alleged loss and damage as the proximate result of the representations.

*E.g. In re Dougherty,* 84 B.R. 653, 656 (9th Cir. BAP 1988). *See also In re Rubin,* 875 F.2d 755 at 758–59 (9th Cir.1989) (citation

omitted); *In re Tilbury,* 74 B.R. 73, 77 (9th Cir. BAP 1987); *In re Houtman,* 568 F.2d 651, 655 (9th Cir.1978); *In re Ophaug,* 827 F.2d 340, 342 n. 1 (8th Cir.1987).

### *Intent*

Although the debtor's brief is somewhat unclear, the record fully supports the finding that the debtor made certain representations to A & A with regard to having met the "pre-billing" requirements which were in fact false. The debtor does not dispute this finding. Rather, the crux of the debtor's argument is that he never intended to deceive A & A. In support of this argument, the debtor contends that Philadelphia Life had informally approved Mr. Moscatel for the $3,000,000 Universal Life policy and thus, when the representations were made, the debtor in no way was intending to deceive A & A. The debtor supports this argument by the fact that the promissory note given to Philadelphia Life for the $58,000 advance commission, *included a policy number* of the Moscatel policy, thereby evidencing the debtor's justified assumption that the policy had been approved. Since the policy had been "approved" by Philadelphia Life, the debtor argues that there was no "intended deception" on his part. Additionally, the debtor points to the fact that obtaining an "advance commission" was a readily accepted policy of A & A. Finally, the debtor contends that he could have made no misrepresentation to obtain the salary increase, because such decisions were totally within the discretion and control of the debtor's supervisors.

Although each element of a nondischargeability action must be shown by clear and convincing evidence, it is also generally recognized that the element of intent to deceive under § 523(a)(2)(A), can be inferred and established from the surrounding circumstances. *E.g. In re Kurdoghlian,* 30 B.R. 500, 502 (9th Cir. BAP

---

**5.** Section 523(a)(2)(A) provides:
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt ... (2) for money, property, services, or an extension, renewal, or refinancing of cred-

it, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
11 U.S.C. § 523(a)(2)(A).

1983); *In re Fenninger*, 49 B.R. 307, 310 (Bankr.E.D.Pa.1985); *In re Schlickmann*, 6 B.R. 281, 282 (Bankr.D.Mass.1980).

This Panel has characterized the "intent" element under § 523(a)(2)(A) as requiring representations *"with the intention and purpose of deceiving* the creditor." *In re Dougherty*, 84 B.R. at 656. The Findings of Fact and Conclusions of Law state that "[the debtor] *intended to deceive* A & A in order to receive [the bonus and salary increase]. Given this finding, the undisputed fact that false representations were made and the circumstances surrounding the entire transactions, this Panel concludes that the bankruptcy court's findings are not "clearly erroneous." *E.g. In re Kurdoghlian*, 30 B.R. at 501 (a finding is clearly erroneous when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.") (citation omitted).

### Reliance

■ The debtor next makes several arguments that appear to attack the bankruptcy court's conclusion that A & A relied on the false representations in issuing the bonus check, namely: that the check obtained from Philadelphia Life included the notation "commission advance" typed on the bottom portion; that A & A was in fact never concerned about the pre-billing criteria and was only concerned that such pre-billed commissions be collected by January 31, 1985; and that the Philadelphia Life account was "in a debit situation" and this information was plainly available to A & A supervisors.

Although each of these contentions are supported by the record, the record also supports the bankruptcy court's findings that: A & A's supervisors had no reason to assume that a commission advance had been made; A & A's supervisors had no obligation to closely scrutinize the Philadelphia Life check or the status of the account; and, specific written statements by the debtor led A & A supervisors to believe that the $58,000 advance from Philadelphia

Life was in fact an earned commission rather than an advance.

Accordingly, there is sufficient evidence in the record to support the bankruptcy court's conclusion that A & A had relied on the misrepresentations. The debtor's arguments appear to be attacking the "reasonableness" of A & A's reliance rather than whether there was actual reliance. In this regard some courts have recognized that reliance under § 523(a)(2)(A), unlike § 523(a)(2)(B), need not be reasonable. *E.g. In re Ophaug*, 827 F.2d 340, 342 (8th Cir.1987). *Cf. In re Rubin*, 875 F.2d 755 at 759 (9th Cir.1989) (noting the conflict between the circuit courts, but finding it unnecessary to rule on the issue). As in the *Rubin* case, however, the record herein supports a conclusion that A & A's reliance was reasonable even if the more strict standard is applied to § 523(a)(2)(A).

### Damages

■ Next, the debtor attacks the bankruptcy court's determination that A & A was damaged by the entire transaction on the basis that A & A had the use of the $58,000 "interest free" and Mr. Moscatel eventually purchased the $5,000,000 insurance policy as originally planned. Therefore, the debtor argues, A & A was not damaged because it eventually received the full commission. This argument, however, fails to recognize the fact that since the original policy amount was not issued during 1984, A & A was not, therefore, obligated to pay the debtor any bonus. The bonus paid to the debtor and the salary increase was a direct result of the assumption that the $5,000,000 policy had been approved during 1984 and was calculated on the debtor's 1984 production levels.

### BAP No. WW 88–1286

In the related cross appeal, A & A argues that the bankruptcy court's summary judgment dismissing its cause of action based on § 523(a)(4) was improper since a "pre-existing fiduciary duty existed" at the time the insurance policy was sold to Mr. Allen and the $20,000 commission obtained. This Panel will review a bankruptcy court's

granting of summary judgment under a *de novo* standard of review. *E.g. Lone Ranger Television, Inc., v. Program Radio Corporation,* 740 F.2d 718, 720 (9th Cir.1984); *Matter of Torrez,* 63 B.R. 751 (9th Cir. BAP 1986), *aff'd on other grounds,* 827 F.2d 1299 (9th Cir.1987).

■ It is now well recognized that under § 523(a)(4), the term "fiduciary" is given a very narrow definition and that only "express" or "statutory" trusts fall within the scope of this section. *E.g. In re Short,* 818 F.2d 693, 695 (9th Cir. BAP 1987).

In the instant case, it is undisputed that no "express" trust existed as between A & A and the debtor. However, A & A contends that a sufficient fiduciary relationship existed as a result of the debtor's status as a corporate officer. In support of this contention, A & A cites several Washington state court cases which determined that under Washington *case* law, corporate officers owe a "fiduciary duty" to the corporation. The concept of a *fiduciary* for purposes of § 523(a)(4), however, is a narrowly defined question of federal law and state law is consulted only for purposes of "determining when a *trust* exists." *Id.* (citation omitted). Additionally, "[t]he trust must have been created before the act of wrongdoing." *Id.* This requirement was correctly stated by the bankruptcy court when it stated "in order to have a breach of fiduciary duty in bankruptcy, there has to be a pre-existing trust."

■ In the instant case, although the debtor may have owed a general fiduciary duty as a corporate officer under state case law, *no pre-existing or statutorily created trust* existed at the time of the alleged wrongdoing. Accordingly, given the undisputed facts, this Panel concludes that the bankruptcy court correctly determined that as a matter of law, the debtor was entitled to summary judgment on the alleged violation of § 523(a)(4).

Based on the foregoing, the decisions of the bankruptcy court are AFFIRMED.