In re DOBBS, Reginald, Dobbs, Karalee, Debtors.

Neal and Julie CUSTER, husband and wife, and Pioneer Title Company of Ada County, an Idaho corporation, Plaintiffs,

v.

Reginald and Karalee DOBBS, husband and wife, and C. Barry Zimmerman, Trustee, Defendants.

C. Barry ZIMMERMAN, acting as Trustee of the bankruptcy estate of Reginald and Karalee Dobbs, Counterclaimant,

v.

PIONEER TITLE COMPANY OF ADA COUNTY, an Idaho corporation, Counterdefendant.

Bankruptcy No. 89–03284.
Adv. No. 90–6017.

United States Bankruptcy Court, D. Idaho.

May 30, 1990.

Lance G. Salladay, Risch, Goss, Insinger & Salladay, Boise, Idaho, for plaintiffs Custer.

Kirk J. Anderson and Rodney T. Buttars, Boise, Idaho, for defendants Dobbs.

Barry Peters, Hamlin & Sasser, Boise, Idaho, for defendant and counterclaimant C. Barry Zimmerman, trustee.

Randall C. Fredricks, Clemons, Cosho & Humphrey, Boise, Idaho, for plaintiff and counterdefendant Pioneer Title Co. of Ada County.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

### I. PROCEDURAL BACKGROUND OF THE CASE.

In July of 1989, the Defendant Reginald Dobbs d/b/a Reg Dobbs Construction, contracted with the Plaintiffs Neal and Julie Custer to build them a house on property they owned near Boise. It is the events that transpired between that time, and November 6, 1989, when Dobbs and his spouse filed a Chapter 7 petition, that have given rise to this adversary proceeding.

In this action, the Plaintiffs Custers seek two forms of relief. First of all, they ask for a declaration by this Court that their claims against Dobbs arising out of his failure to pay certain suppliers and subcontractors on the construction project be declared nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) and (4).[1] Secondly, Custers seek to impose a constructive trust on certain funds now in the hands of the Chapter 7 Trustee Zimmerman on the basis that the money is directly traceable to a payment they made to Dobbs on the eve of his bankruptcy, and should equitably be held for the specific creditors on their house project. Dobbs vigorously resists the non-

---

1. At this point, the extent of any alleged nondischargeable debt is uncertain because, as will be seen, the suppliers and subcontractors have not been paid by either Custers or Dobbs. Rather, they have asserted a variety of liens against the property, aggregating approximately $75,000 in amount, and are in various stages of the collection process. The fact that Custers may dispute some of these claims, and have not paid any of them, is not fatal to their Section 523(a) action, however. The statute allows for a determination that "debts" are nondischargeable, and "debt" is defined in the Code as "liability on a claim", 11 U.S.C. § 101(11). "Claim" is defined in turn as a right to payment or other relief, whether matured or not. 11 U.S.C. § 101(4). The Courts have held that the terms "debt" and "claim" have the same broad meaning, and that Congress intended their definitions to be coextensive, with any differences merely being that inherent in describing a term from opposing points of view. See In re Quintana, 107 B.R. 234 (9th Cir.B.A.P.1989). In addition, actions must be brought under Sections 523(a)(2) and (4) within sixty days of the date of the creditors' meeting. Bankruptcy Rule 4007. Obviously, therefore, creditors have the right, or more properly the responsibility, to pursue nondischargeability declarations even though final liability may not yet have been adjudicated. By the same token, any finding of nondischargeable status will only apply to those claims which finally mature into debts.

dischargeability claims, and the Trustee disputes Custers' rights to the funds.

The plot is further complicated by the presence in this action of Pioneer Title Company, who in September of 1989 issued a title insurance policy in favor of the Custers' lender, Benjamin Franklin Savings & Loan (hereinafter BFS & L), based in part on the execution of an indemnity agreement in its favor by the Custers and Dobbs. Pioneer joined as an additional Plaintiff after commencement of the action by Custers. The Court previously denied its efforts to join in the nondischargeability claim because of its tardy appearance, but it is cooperating with Custers in connection with efforts to capture the remaining cash for payment of suppliers. The Trustee also filed a somewhat vague counterclaim against Pioneer alleging a right to recover under the title policy.

The Court listened to extensive testimony at the trial of this matter and has considered the thoughtful and persuasive written arguments and authorities provided by counsel. After considering all, what follows are the Court's findings of fact and conclusions of law issued pursuant to Bankruptcy Rule 7052.

## II. FACTS.

The Custers sought out a proposal from Mr. Dobbs in July of 1989 to build them a home on land previously purchased for that purpose based upon a referral from friends and general knowledge of his business in the community. Dobbs provided Custers with an impressive brochure (Exhibit No. 45) detailing his extensive education (B.A. in accounting/finance; M.B.A.; post-graduate study at Stanford); professional memberships and leadership positions; and vast experience. In the brochure, he admonished prospective builders, in selecting a contractor, to require "... [f]irst and foremost your builder must be financially responsible ..." and he suggests that "... Reg Dobbs meets and exceeds these qualifications ..." The parties thereafter executed a "Building Agreement" (Exhibit No. 2) prepared by Dobbs, wherein he agreed to build Custers' house for $139,158, with $5000 payable immediately, and the balance due as costs accrued during construction from the proceeds of a construction loan. At a final closing, Dobbs agreed to provide Custers with "... builder's sworn statement and waivers of lien or equivalent waiver of objection from the title insurance company indicating that all labor and materials are fully paid." Building Agreement ¶ 3.

Dobbs then embarked upon construction of the Custer house, which was one of several he then had underway, as either custom-built or "spec" houses. Custers sought a construction loan and originally there were complications associated with the appraised value of their proposed home. Dobbs contacted the Custers occasionally and urged them to resolve the financing problems since construction was in process and he needed "... to get the subs paid." With regard to at least one supplier, he indicated he had advanced the monies and needed to be reimbursed. From the evidence, it is fair to conclude the parties anticipated most of the bills for the construction would be paid out of the anticipated loan disbursements.

Custers finally secured a construction loan from BFS & L in September. A "Residential Construction Loan Agreement" was signed by Custers, Dobbs and the lender providing that payments would be disbursed on the "construction draw system". While Dobbs admits he signed the multi-page document, he denies having seen or read anything other than the front page of the document, or receiving a copy of the contract. In fact, while the Custers were required by the loan closing agent to initial each page of the document, Dobbs' initials are not present.

The BFS & L Agreement provides that when a disbursement of loan proceeds was sought, the contractor and the owners were to prepare, sign and submit a disbursement request certifying that all materials and labor supplied through that date had been paid in full. The loan agreement and disbursement forms, on their face, leave no mistake that the intended process is one of reimbursement of the contractor from the

loan proceeds for sums previously paid to suppliers. However, from the testimony of the Custers, Dobbs, and the BFS & L loan officer, in practice, all understood that generally suppliers were to be paid from the loan monies in the first instance. While Custers and the lender believed that payment was to be a simultaneous process, such was not the case in the mind of Mr. Dobbs. In fact, as shocking as it may seem, from the testimony of another local building contractor, it is apparently common for loan proceeds to be deposited by the contractor into a general operating account, and for those funds to be used not necessarily to first satisfy outstanding claims against that particular construction project, but to pay whatever expenses and bills most demanded immediate attention. As Mr. Dobbs described it, the squeaky wheel evidently does command the grease in this industry.

The situation was therefore ripe for disaster when in the late summer and early fall of 1989 Dobbs began experiencing, to an increasing degree, "cash-flow" problems. The timing and extent of the problems is significant, beginning earlier with Dobbs' inability to sell his spec houses for the desired return, and later, a lack of success with respect to a proposed jointly sponsored commercial project, as well as the loss of another prospective residential contract. Finally, in late October of 1989, the cash shortages had become so severe as to motivate Dobbs to consult with Mr. Buttars, an attorney, about his financial difficulties and a possible "workout". The end of Reg Dobbs Construction came on November 7 with the filing of a Chapter 7 petition.

Along the way, however, the Custers' home had been completed. Dobbs had taken a total of three draws against the loan in addition to the down payment: $39,841 in early September; $33,335 in early October; and the final draw of $50,595.67 on November 3, 1989. While obviously some Custer suppliers had been paid from the monies, and from other income received by Dobbs from other projects, the Custers now testify that they have received lien claims from subcontractors and suppliers on their house totaling approximately $75,-000 since the Dobbs' bankruptcy was filed. While Custers attack Dobbs' conduct with respect to each of the disbursements, it is the final draw that was most critically examined at trial. As will be discussed more completely below, Dobbs has surrendered $20,833.67 to the Trustee in funds "on hand" when the bankruptcy case was filed. Not only do Custers therefore seek a nondischargeability judgment arising out of each disbursement, but it is these funds they urge, along with Pioneer, that should be impressed with a constructive trust.

The Court will analyze each of the claims asserted in this action, filling in additional relevant facts as are required to explain its decision.

## III. THE DISCHARGEABILITY CLAIMS.

### A. Generally.

The Custers have asserted that the obligations of Dobbs arising from his failure to pay suppliers from the loan proceeds are nondischargeable in his bankruptcy under Sections 523(a)(2)(A) and (4). In applying these exceptions to discharge, the Court must construe them strictly against the creditor and liberally in favor of the debtor. "Any other construction would be inconsistent with the liberal spirit that has always pervaded the entire bankruptcy system." *3 Collier on Bankruptcy* ¶ 523.05A, 523–16–17 (15th ed. 1988) *citing, inter alia, In re Rahm*, 641 F.2d 755, 756–57 (9th Cir.1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981).

■ The creditor has the burden of proving the necessary elements of these dischargeability claims involving aspects of fraud by clear and convincing evidence. *In re Hultquist*, 101 B.R. 180 (9th Cir.B.A.P. 1989).

### B. Section 523(a)(4).

The Code does not allow discharge of any debts "... for fraud or defalcation while acting in a fiduciary capacity, embezzle-

ment, or larceny ..." 11 U.S.C. § 523(a)(4). Unlike the general fraud exception, discussed below, this provision requires as a condition of its applicability a special relationship to have existed between the debtor and the objecting creditor. With respect to the first clause of the exception, the Court must initially find that the debtor was "acting in a fiduciary capacity", a requirement having a long history in the bankruptcy laws and being limited in its scope:

"The qualification that the debtor be acting in a fiduciary capacity has consistently, since its appearance in the Act of 1841, been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose." *3 Collier on Bankruptcy* at ¶ 523.14, 523–96.

Whether a "trust relationship" sufficient for purposes of the exception to discharge exists has received attention in the cases in this Circuit. *See, e.g., In re Teichman*, 774 F.2d 1395 (9th Cir.1985) (ex-husband's failure to pay ex-wife her portion of retirement benefit is dischargeable since no trust established by property settlement agreement); *In re Thornton*, 544 F.2d 1005 (9th Cir.1976) (debtor's obligation to pay amounts withheld from employee wages to union vacation account is dischargeable where no trust created by collective bargaining agreement). The following provides an outline of the analytical framework under the controlling cases:

"Because the broad general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context, ordinary commercial relationships are excluded from the reach of Section 524(a)(4). The trust must have been created before the act of wrongdoing. The debtor must have been a trustee before the wrong and not a trustee *ex maleficio*. Thus,

constructive or implied trusts are excluded, but statutory trusts are not. Although the concept of fiduciary capacity is a narrowly defined question of federal law, state law can be consulted to determine when a trust exists." *In re Short*, 818 F.2d 693, 695 (9th Cir.1987) (holding that a joint-venturer was a fiduciary under Washington partnership law).

*See also, In re Hultquist*, 101 B.R. at 185.

■ Therefore, in order to meet the narrow fiduciary capacity standard enunciated by the cases, an express trust relationship, created either by agreement or statute must be found to pre-exist the acts upon which the allegations of fraud or defalcation are based.

In the case before the Court, the several documents admitted in evidence have been reviewed and, it appears, none are adequate to satisfy the creditors' burden. Neither the original building proposals submitted by Dobbs, nor the actual "Building Agreement" create an express trust with respect to the progress payments. The various "Orders for Reimbursement" (Exhibit Nos. 24–26) contain statements to the effect that all materials and labor used in the construction to date have been paid in full, something that was obviously untrue to all concerned, but they do not evidence any intent to create a fiduciary relationship by agreement between Dobbs and Custers.

■ The "Residential Construction Loan Agreement" (Exhibit No. 4) deserves special attention in this regard. It is true that the document contains what appears to be trust-type language in Paragraph No. 6.[2] However, the Court is unwilling to allow this provision to control under the facts of this case for several reasons.

First of all, there is a serious factual question as to whether Mr. Dobbs can be charged with knowledge of the contents of this provision. While there is proof he signed the cover sheet to the agreement, he

---

**2.** "Borrower and Contractor agree that all funds received hereunder from the L/P account are received in trust for the purpose of paying in full all contractors, materialmen, and laborers (other than Borrower and Contractor herein) then or theretofore engaged in said construc-

tion, and that Borrower and Contractor shall not have any beneficial interest in said funds unless and until said purposes have been fulfilled. Labor costs may, at the option of Lender, include the reasonable value of labor performed by Borrower."

denies having ever seen the remaining pages or having received a copy. His claim is corroborated by the fact that the Custers were not only required to sign the face of the document, but also to initial each and every individual page. The Plaintiffs were unable to rebut Dobbs' contention and, in fact, the witness from BFS & L was similarly unable to provide any evidence from his file that would indicate Dobbs' agreement to the provisions appearing other than on the first page of the document.

The evidence showed that the agreement and its terms were not clearly understood by any of the parties. The BFS & L loan officer admitted that the contract is ambiguous and confusing, even to him. Dobbs and both Custers also had difficulty in responding to questions concerning the existence, location or effect of individual provisions of the contract. The Court is therefore extremely reluctant, with this background, to strictly interpret and selectively enforce individual clauses of the agreement.

Next, even if the subject provisions were agreed to and understood by Dobbs, a fair reading of the contract as a whole would suggest that any trust provisions were designed for the protection and benefit of the lender, not the Custers.[3] The Court is left with considerable doubt as to whether if a trust was intended, whom the beneficiary of the trust was to be, keeping in mind that BFS & L is not the objecting creditor in this action.

Finally, it is apparent from the evidence that even if a trust was established by the tri-party construction loan agreement, the parties disregarded, or at least substantial-

ly modified the relevant requirements, by their conduct during the course of construction. The BFS & L witness and both Custers were aware that Dobbs was not paying for all construction costs in advance from his own funds and using the loan proceeds for reimbursement. While the agreement adopts the "construction draw system" for loan proceeds disbursement, all concerned effectively waived the reimbursement aspects of these provisions.[4] Dobbs would have been in compliance with the intent of the lender and Custers if he would have made substantially simultaneous payments to suppliers *after* receiving a loan disbursement, according to the witnesses. When all were aware that the details of the disbursement system were not being observed and had no objection to it, it is difficult for the Court to allow the Custers to now strictly enforce other complimentary terms of the agreement. *See General Electric Credit Corp. v. Graham*, 7 B.R. 5 (Bankr.D.Nev.1980) (A trust clause inserted in a document which establishes a debtor-creditor relationship in an effort to assure the debtor's performance of an obligation does not create a trust.) *citing In re Lord's, Inc.*, 356 F.2d 456 (7th Cir.1965) *cert. denied*, 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966) (conduct of the parties can overcome trust language in document) and *Wohl Shoe Co. v. Elliott*, 388 F.2d 883 (9th Cir.1967).[5]

Having concluded that there is inadequate evidence of a consensual fiduciary relationship between Dobbs and Custers, under the case law the only other possible basis for the relationship would be a statutory one. However, neither the Custers

---

3. For example, Paragraph No. 5 of the Agreement makes the Contractor the "agent" of the Borrowers for purpose of receipt of funds, and provides further that ... "Borrower assumes all risks of misapplication or loss of said funds by Contractor ..."

4. In fact, under the "construction draw system", there is no need for a "trust" provision. That is, if all draws are intended to reimburse the Contractor for amounts previously paid to suppliers, it is inconsistent and confusing to attempt to impose a trust as to those funds when paid to the Contractor.

5. The Court is mindful of the decision in *In re Gonzales*, 22 B.R. 58 (9th Cir.B.A.P.1982) relied upon by Custers as controlling in this case. The Court feels the case is not dispositive here, since the debtor in *Gonzales* did not challenge on appeal the trial court's conclusion that a subcontract created an express trust. The B.A.P.'s opinion is predicated on the trial court's factual finding in that regard, whereas here the Court cannot make such a finding. The contract in *Gonzales* was one directly between contractor and subcontractor, with the contractor attempting to enforce its beneficial position. The case is distinguishable.

nor Pioneer have directed the Court to any statutes for such a proposition, nor has the Court discovered such a legal basis through its own research. Of interest at this point is the case *In re Pedrazzini*, 644 F.2d 756 (9th Cir.1981). At the time *Pedrazzini* was decided, there were statutes in California that made diversion of construction payments to the contractor's own use grounds for both disciplinary action concerning the contractor's license, and for criminal sanctions. In spite of the existence of these laws, the Ninth Circuit refused to imply a trust status for the funds in the hands of the contractor justifying a determination of nondischargeability in bankruptcy. Were Idaho to have similar statutes, which evidently it does not, even then a finding of fiduciary capacity would require a strict reading of the language of the statutes. Simply put, there is an inadequate showing in this action to find that Dobbs was acting in a fiduciary capacity with regard to the Custers.

Section 523(a)(4) also excepts debts based upon embezzlement or larceny. "Embezzlement" in the dischargeability context "... is the fraudulent appropriation of property by a person to whom such property has been entrusted ..." *2 Collier Bankruptcy Manual*, ¶ 523.05, 523–21 (3d ed. 1990). It likewise assumes, as an element, a special trust relationship. Idaho's criminal statutes have required the accused to be a fiduciary as to the injured person to sustain a conviction for embezzlement. *See State v. White*, 46 Idaho 124, 266 P. 415 (1928). Suffice it to say, the same sort of guidelines in construing the Code come into play in the "embezzlement" inquiry as discussed above. In fact, with its criminal connotation, the term as utilized in the statute may even suggest a higher degree of proof would be required.

"Larceny" differs from embezzlement in the fact that the original taking of property

was unlawful, and without the consent of the injured person. Here, neither the evidence nor the Plaintiffs suggest that Dobbs came into possession of the loan proceeds unlawfully or without Custers' consent. The wrong that is alleged occurred after the funds were disbursed and not paid to the construction suppliers and contractors.

The Custers have failed to prove their case under Section 523(a)(4).

**C. Section 523(a)(2)(A).[6]**

▮ The "actual fraud" exception to discharge is found at 11 U.S.C. § 523(a)(2)(A) and concerns debts incurred through "... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ..." Because of the frequency that it is alleged as a basis for relief in bankruptcy cases, a well-developed set of elements of the cause of action is available. The objecting creditor must prove, by clear and convincing evidence that:

1. The debtor made a false representation of a material fact;

2. with the intention and purpose of deceiving the creditor;

3. upon which representation the creditor reasonably relies; and

4. as a result of which, the creditor sustains a loss or damage.

*See, e.g., In re Briscoe*, 90 I.B.C.R. 57; *Hauck v. Crawford*, 90 I.B.C.R. 14; *Montgomery v. Higley*, 88 I.B.C.R. 341; *Long v. Olson*, 88 I.B.C.R. 185; and *Vadnais v. Spaulding*, 87 I.B.C.R. 147. *See also In re Hultquist*, 101 B.R. at 183.

▮ The "frauds" encompassed by this subsection all involve moral turpitude or intentional wrongs; fraud implied in law which may exist without imputation of bad

---

**6.** The Custers' Amended Complaint alleges that the obligations in question are excepted from discharge under Section 523(a)(2), without specifying the appropriate subsection. However, a review of the substantive allegations of the pleading, and based upon the evidence adduced at trial, it is obvious to the Court that subsection (A) is relied upon by the Custers. Subsection

(B) of the statute deals with the use of fraudulent financial statements as a basis for incurring the debt. The only financial statement produced was given by Dobbs to BFS & L, and Custers never saw it prior to Dobbs' bankruptcy. Even if the Court is mistaken in its assumption, the Custers have clearly failed to prove a claim under subsection (B).

faith or immorality is not sufficient. They require deceit, artifice, trick or design coupled with the direct and active operation of the mind, used to circumvent and cheat another—something said, done, or omitted with the design of perpetrating what is known to the debtor to be deception. *3 Collier on Bankruptcy* ¶ 523.08, 523–45–52 (15th ed. 1989). A step-by-step analysis of the evidence is therefore appropriate with the standard of proof in mind.

The Court listened to a variety of witnesses including the Custers and Mr. Dobbs and finds, as a matter of fact and law, that all of the elements of fraud discussed above are present to some degree. The crucial concern is, naturally, have the elements each been proven clearly and convincingly?

Dobbs is guilty of making false representations both expressly and impliedly. It is true that the Building Agreement contains no affirmative representation that Custers' progress payments would be dedicated first to payment of costs incurred on their home. However, in the Construction Loan Agreement, the various orders for reimbursement, in his conversations with Custers, and in his communications with the lender, the understanding, if not express, is clearly implied that Dobbs would use the loan and other funds he obtained to satisfy the bills incurred on the Custer home in a substantially simultaneous fashion. A man with his education and experience cannot be so naive as to think that the Custers would risk their money to the extent that this construction project entailed without such a guarantee.

■ The fact that it is apparently common for a residential building contractor in the Boise area to "rob Peter to pay Paul" as was testified to by Mr. Borup, another local builder, and Mr. Wadsworth, an accountant for several builders, should not insulate the builder against a claim of fraud *unless* the practice is clearly disclosed to or understood by prospective customers. That is, it is not as important that diversion of funds is sanctioned in the local industry as it is that the public in general, and the Custers in particular, are unaware

of this fact. Mr. Dobbs admitted under cross-examination that he never disclosed to the Custers his practice of diverting funds. This omission, coupled with the common interpretation associated with many of the statements made and documents executed by Dobbs, constitutes, in the opinion of this Court, a false representation of a material fact.

Two of the other elements are also readily apparent from the evidence. Custers were relying on the fact that outstanding costs were being paid from monies disbursed to Dobbs. The forms submitted to BFS & L contained itemized lists of expenses and suppliers and the disbursements were calculated based upon these lists and figures. It is also reasonable to accept the Custers' word that had they known that the suppliers were not being paid, further disbursements would have been conditioned or suspended. Given the glowing statements made by Mr. Dobbs in his brochure about his professionalism and financial condition, the Custers were reasonable in making this assumption.

Likewise, the Custers have, or probably will, suffer a substantial financial loss as a direct result of their willingness to trust Dobbs. Admitted into evidence were copies of sworn lien claims filed on the public record by various suppliers and subcontractors wherein almost $75,000 worth of claims are asserted against their home. Under the Idaho statutes, if these claims prove to be valid and are prosecuted, as appears likely, Custers will be forced to either settle the accounts or face loss of the house through foreclosure of the liens. *See Idaho Code* §§ 45–501 *et seq.*

The most troublesome aspect of this case is with the "intent" element to the fraud claim. Dobbs repeatedly protested through his testimony that at all relevant times right up to the morning he made the decision to file for bankruptcy relief (i.e. November 7), he sincerely intended to satisfy all claims on the construction project from either the sale of his assets, other anticipated income, or through a creditor "workout". In light of his statements, Custers must therefore impeach the wit-

ness through reliance on circumstantial evidence. This, in the opinion of the Court, they have only been able to partially accomplish.

Dobbs took four payments from the Custers from July through November of 1989. The first payment was a $5000 downpayment accepted at the inception of the project. No evidence was offered by Custers as to the disposition of these funds, or attempt made to show a fraudulent intent at that time. Custers do claim they were defrauded with respect to each of the three loan disbursements made by the lender in September, October and November. These payments totaled $123,771.67. With these payments, together with certain other credits, Custers' obligation to Dobbs was paid in full.

Custers point to Dobbs' generally deteriorating financial condition as evidence of his intent to deceive them in accepting the disbursements and diverting the monies. This approach is problematic with respect to the September and October payments.

■ There is little proof concerning what disposition Dobbs made of the first two disbursements. While it is true that if all $75,000 of the outstanding lien claims are valid, some of the disbursements must have been diverted to other purposes. However, the evidence does not provide the kind of specificity of proof required by a clear and convincing standard. While Dobbs' checking account statements were admitted into evidence for the months of October through December, no copies of checks were provided until the period commencing with November 1. There is no showing as to what extent any of the September or October disbursements were diverted to other uses by Dobbs.

The Court finds inadequate circumstantial evidence of fraudulent intent for the September/October period. While Dobbs was experiencing financial woes, the evidence does not suggest that the situation was irreversible at that point, or that

Dobbs had given up hope of recovery. He still had substantial potential income available from other actual and anticipated projects and asset sales.

The Court did not ignore the testimony of Mr. Jackson, and evidently, the fact that Dobbs was also likely engaged in diverting the proceeds from that home construction project during this general time frame. However, as stated above, there is a lack of details in the record to show the extent of any financial misdealings to justify a nondischargeable claim in favor of the Custers as to these two disbursements.[7]

■ The final disbursement made on November 3 to Dobbs presents a different situation, though. Abundant evidence was presented at the trial to circumstantially rebut Dobbs' claims that his intentions were pure with respect to his receipt of over $50,000. These are catalogued below.

During the late summer and fall of 1989, Dobbs was also constructing a house for Mr. and Mrs. Jackson in Boise. Jacksons were pressuring Dobbs to take possession of the home in mid-October. Unfortunately, while Dobbs had been paid about $150,-000 by Jacksons, there were over $100,000 in unpaid supplier and subcontractor claims against this house. In late October, Jacksons were attempting to contact Dobbs about their house, but were unable to do so, and were attempting to work directly with the various subcontractors.

In October, Dobbs began negotiating with certain creditors offering to transfer his equity in certain assets and properties to them in satisfaction of debt. He was unable to strike a deal.

In mid-October, Dobbs began to actively market various assets. He took out an advertisement in a local paper to sell his personal pickup.

Dobbs' other projects were not looking favorable. The commercial joint-venture was stalled, spec houses were not selling, and he was having trouble with "difficult"

7. While it is unlikely, it is not impossible that Dobbs may have been using Jackson funds to pay Custers' costs. This is speculation based on this incomplete record, but if it were true, Custers may have been benefited by the state of Dobbs' finances. There was evidence offered that some of the Custer bills were paid with "non-Custer" monies by Dobbs.

customers on prospective custom home projects. In addition, under the terms of his financing arrangements on the spec houses, he was obligated to begin making interest payments to his lenders in November.

The testimony of Mr. Gammill, a friend and also a builder, revealed that a conversation had occurred several weeks prior to Dobbs' bankruptcy wherein Dobbs said that he was not making any money as a builder, was ready to get out of the business, and wanted Gammill to take over and complete certain projects. Gammill, testifying under Custers' subpoena, also told of how Dobbs had asked that Gammill keep the substance of the conversation a secret.

In the few days before final settlement with the Custers, Dobbs contacted Pioneer Title and requested that an owners' extended coverage title policy be issued in favor of the Custers, thereby ensuring they would be protected against subsequent lien claims. He was informed that since he did not own the property, Pioneer would not issue such a policy. Dobbs admitted he was not proposing to disclose to Pioneer the outstanding supplier and subcontractor claims on the project. He successfully purchased a policy on the Jackson house. He points to his efforts as an example of his intent to protect the Custers, even if his means of doing so were highly questionable.

On October 26, 1989, Dobbs had a conference with Mr. Buttars, his bankruptcy attorney, discussing his financial problems in general terms and his desire to attempt a creditor "workout". Buttars requested more comprehensive information from Dobbs, which was provided, along with a $5000 retainer, on November 1. Although the Court has some doubt about the actual date, Buttars and Dobbs both contend that Dobbs never communicated instructions to file for bankruptcy to his lawyer until the

morning of November 7, and that a "quick filing" was accomplished that afternoon.[8]

Dobbs met with the Custers on November 2 to review the final reconciliation and settlement on the house account. On November 3, the parties submitted the final disbursement form to the lender and Dobbs was paid a total of $50,595.67. The BFS & L form indicated the payment was sought "for completion of all work except landscaping." (Exhibit No. 26). The money was deposited the same day into Dobbs' general operating account.

Between November 3, when the final Custer draw was deposited, and November 7, the date of bankruptcy, numerous checks were written by Dobbs on his account,[9] both in payment of Custer bills, and for other purposes. It appears that substantial sums were expended on "non-Custer" accounts. Among these checks were payment of several of Dobb's living expenses, including an advance payment on his auto loan, utilities, dental bills, clothing accounts, insurance premiums, and withholding taxes. Many checks were also written for business expenses other than on the Custer project. After filing bankruptcy, Dobbs eventually delivered to Mr. Zimmerman, the Trustee, a total of $20,833.67 from the account.

The circumstances existing on November 3, and Dobbs' specific knowledge of those facts, lead the Court to the conclusion that he intended to defraud the Custers of the loan proceeds to the extent he diverted those proceeds to other uses than paying bills associated with their home construction project. To the extent that he used the money to satisfy claims against the Custer job, and to the extent he turned the monies over to the Trustee, Dobbs will not be penalized. However, the Court determines that all payments made by Dobbs on "non-Custer" accounts were from funds

**8.** The initial petition and related documents filed with the Court are all dated November 6. In addition, the Bankruptcy Rule 2016(b) declaration of Mr. Buttars filed in this case indicates he agreed to a fee of $5000 for his services "in connection with the bankruptcy case". Buttars testified at trial, though, that in fact the fee was

originally intended to cover other services to be provided prior to the decision to file a petition.

**9.** Deducting all checks written prior to the deposit of the Custer disbursement, Dobbs had $4034.12 already on deposit in his general operating account.

fraudulently appropriated by Dobbs, and the corresponding obligation to the Custers is not dischargeable under Section 523(a)(2)(A).

The evidence is lacking as to the involvement of Mrs. Dobbs in this scheme. While the proof suggests that Mrs. Dobbs signed several checks, and was involved to some degree in helping with the business accounting and books, it does not show her to be implicated in any fraudulent activity. No finding of nondischargeability will be made as to her obligations to the Custers, if any.

## IV. THE CONSTRUCTIVE TRUST CLAIM.

Both the Custers and Pioneer Title seek to have a constructive trust imposed by the Court on the funds turned over by Dobbs to the Trustee from his operating account amounting to $20,883.67. They do so on the theory that the funds represent the remaining amounts given to Dobbs on November 3 as part of the final loan disbursement, and since the funds were obtained through his fraud, the money should be held for the benefit of the various unpaid Custer suppliers. The Trustee resists this argument contending that the funds, having been commingled in Dobbs' general account, represent property of the estate, and should be available for distribution to all creditors in the bankruptcy case. To reach a decision on this issue, the Court must resolve (1) whether imposition of a constructive trust is appropriate under the facts of this case and applicable case law; and (2) if so, to what extent do the monies given to the Trustee represent "trust funds"?

■ Property held by the debtor in trust does not become property of the bankruptcy estate. 11 U.S.C. § 541(d). A constructive trust, though, is not truly a trust in the classic sense, but is actually an equitable remedy designed to prevent injustice. *See Davenport v. Burke,* 30 Idaho 599, 608, 167 P. 481 (1917) ("Constructive trusts are raised by equity for the purpose of working out right and justice, where there is no intention of the party to create

such a relation, and often directly contrary to the intention of the one holding legal title.") The cases show this Circuit has considerable experience in defining the relationship between such devices and the federal bankruptcy laws.

■ The propriety of imposing the trust must be established as a matter of state law. The Idaho cases provide ample authority for use of this remedy to prevent another from benefiting from wrongful conduct whether or not such conduct amounts to actual fraud. Rather all one must show is that circumstances exist which renders it "unconscionable" for the holder of legal title to retain the benefits of the property. *Witt v. Jones,* 111 Idaho 165, 722 P.2d 474 (1986); *see also Klein v. Shaw,* 109 Idaho 237, 706 P.2d 1348 (1985) (a constructive trust may be created by a court of equity whenever title to property is found in one who in fairness ought not be allowed to retain it.)

■ The analysis does not end with the Idaho cases, though. As the Ninth Circuit advises:

"While we agree that any constructive trust that is given effect must be a creature of state law, we cannot accept the proposition that the bankruptcy estate is automatically deprived of any funds that state might find subject to a constructive trust. A constructive trust is not the same kind of interest in property as a joint tenancy or a remainder. It is a remedy, flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems to call for it ... We necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws." *In re North American Coin & Currency, Ltd.,* 767 F.2d 1573, 1575 (9th Cir.1985), *cert. denied sub nom. Torres v. Eastlick,* 475 U.S. 1083 [106 S.Ct. 1462, 89 L.Ed.2d 719] (1986).

Therefore, at a minimum, not only must the trust be an available remedy under state law, application of the principal in this case must be consistent with the policies of the bankruptcy laws. The analysis must balance the equities of Custers and Pioneer Title as against the interests of the general creditors of Dobbs' bankruptcy estate.

In September of 1989, in connection with the BFS & L construction loan, a title insurance policy was purchased for the benefit of the lender from Pioneer. Since construction had commenced, Pioneer required both Dobbs and Custers to execute a special indemnity agreement in its favor to protect the insurer against any possible unpaid lien claims. There is insufficient evidence in the record to demonstrate that Dobbs' execution of the indemnity agreement was fraudulent or that his failure to pay any lien claims at that time was motivated by fraud. In addition, there is no evidence that any of the funds eventually paid over to the Trustee by Dobbs relate to any payments or disbursements other than the November 3 transaction. Therefore, it is clear to the Court that Pioneer is in no position to successfully urge imposition of a trust. Any equities in favor of Pioneer do not outweigh those that may exist in favor of the other general creditors of the bankruptcy estate.

 The question becomes whether imposition of a trust is appropriate at the request of the Custers. With respect to any fraud claims relating to the September or October advances, just as with Pioneer, no proof has been shown that any funds on hand today relate to those payments, and the Court cannot find fraud in Dobbs' receipt of those monies. As to the November 3 payment, however, there is a finding that actual fraud was employed to gain the final payment. Where a specific fraudulent intent is found to exist, use of a constructive trust is consistent with the policies of the Bankruptcy Code, all other necessary factors being satisfied. *In re North American Coin & Currency, Ltd.*, 767 F.2d at 1575–76. The equities seem to clearly favor the Custers *as against Dobbs*.

But the Court cannot conclude, as a matter of law, that Custers should be favored over all of Dobbs' other innocent creditors, which is the required focus. *See In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1419–20 (9th Cir.1986) (Court refuses to impose a constructive trust on real property where transfer was avoided as a preference due to failure to record deed.) In addition, "[n]o state court decree imposing a trust exists in the present case; thus [Custers'] entitlement to such a remedy is inchoate, at best." 778 F.2d at 1419.

Custers had several means of protecting their interests against the claims of suppliers. Under the BFS & L loan agreement, for example, they could have elected to have funds disbursed to Dobbs on the "voucher system" allowing for payments directly to suppliers by the Lender. They could have insisted on strict compliance by all involved with a reimbursement system, requiring the contractor to pay bills, and then be reimbursed from loan funds. They could have required Dobbs to provide them with evidence at various times prior to and at the final reconciliation demonstrating payment to suppliers. Put another way, while it was reasonable for the Custers to rely on Dobbs to handle the money properly, there was a certain degree of risk inherent in their decision to do so which in the opinion of the Court weighs against them in comparison to the status of Dobbs other creditors. That Dobbs would file bankruptcy is part of that risk.

In a bankruptcy case, all creditors holding claims have suffered the broken promises of the debtor. While Custers have been injured by Dobbs' conduct here, there is not a sufficient basis to treat Custers in preference to the other creditors he has failed to pay. For example, it is difficult to see how the equities favor the Custers over the Jacksons (or their title insurer) or their unpaid suppliers based upon the evidence presented to the Court. For reasons of federal bankruptcy policy, the Court should be extremely reluctant to exercise general equitable powers in favor of one creditor when it is apparent there are several creditors who sustained similar substantial loss-

es. *In re North American Coin & Currency, Ltd.*, 767 F.2d at 1577.

 Alternatively, there is another difficulty involved in applying the constructive trust theory to the funds on hand. As noted above, there were approximately $4,000 in monies in Dobbs' operating account when he deposited the last Custer disbursement. Custers bear the burden of clearly tracing any funds they claim to be subject to the constructive trust and overcoming the presumption that the money is property of the bankruptcy estate. *See In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir.1988); *Elliott v. Bumb*, 356 F.2d 749 (9th Cir.) *cert. denied*, 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966); *In re Sierra Steel, Inc.*, 96 B.R. 271 (9th Cir.B.A.P.1989). The evidence and testimony presented at trial from accounting experts for each side established that there are no accepted means by which to establish that the funds delivered to the Trustee were solely "Custer funds".[10]

With respect to tracing, the Court has already given the Custers the "benefit of the doubt" in determining the amount that Dobbs misappropriated from the Custer disbursement, above. That is, if Custers' arguments are accepted and if all of the funds remaining in the account delivered to the Trustee were Custer funds, it must be assumed that the $4,000 already on deposit on November 3 was used to make some of the non-Custer payments on which the non-dischargeability judgment will be based.

While it may seem harsh to the Custers, the simple fact is that several creditors fell victim to a willingness to trust Mr. Dobbs and, under the time-honored principals encompassed by Congress in the Bankruptcy Code, all creditors must share in the loss ratably. Although a constructive trust

might be an available remedy under state law, the equities and facts of this case require the Court to defer to the Congressionally established creditor priority rules.

## V. THE TRUSTEE'S COUNTERCLAIM.

Mr. Zimmerman seeks to recover from Pioneer under the terms of the title policy issued in September of 1989. However, the facts show no basis for any recovery.

The title policy, Exhibit No. A, insures BFS & L with respect to the construction loan. Dobbs testified he did not purchase the policy. Reviewing the terms of the policy fails to disclose any possible basis that the Dobbs' bankruptcy estate may claim for asserting coverage. Given such a total lack of proof, Trustee's counterclaim has no merit and should be dismissed.

## VI. CONCLUSION.

While the above will likely disappoint each of the parties to some degree,[11] it represents the considered findings and conclusions of the Court. The Custers' claims against Reginald Dobbs are declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) to the extent of any payments by Dobbs on non-Custer accounts subsequent to November 3, 1989. Counsel for Custers and Pioneer shall submit an appropriate form of judgment within ten (10) days, together with a memorandum individually identifying all payments made by Dobbs used in calculating the amount of the non-dischargeable liability. Counsel for Dobbs and Trustee shall have five (5) days to object to the proposed judgment or calculations. As previously indicated, the judgment must provide that it shall be enforceable only to the extent Custers are eventually required to satisfy claims made against their home. Trustee's counter-

**10.** Much argument and testimony has been presented that "LIFO" and "FIFO" accounting rules may be employed to come to a conclusion as to the traceability of the funds. After considering the evidence, however, the Court is convinced that there is no clearly accepted rule to be applied in the building and construction industry, as compared to, say, generally accepted inventory or accounts receivable accounting principles. Dobbs' books were kept on a cash

basis which makes use of such rules inappropriate.

**11.** "... [T]he Court feels obliged to note that the law does not provide redress for every wrong or injury suffered by individuals in the ordinary course of their business. This is even more true when the laws relating to bankruptcy and dischargeability are applied." *In re Criswell*, 52 B.R. 184 (Bankr.E.D.Va.1985).

claim will be dismissed. Court costs are awarded to Custers and Pioneer as provided by the rules.