**In re Philip RUBIN, Debtor.**

**Philip RUBIN, Appellant,**

v.

**Hugh E. WEST; Yasue West, Appellees.**

**No. 88–6217.**

United States Court of Appeals,
Ninth Circuit.

Submitted May 3, 1989.*

Decided May 19, 1989.

Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Lesley A. Ash, San Diego, Cal., for appellant.

Linda G. Workman, Monaghan & Metz, San Diego, Cal., for appellees.

Before SNEED, REINHARDT and BRUNETTI, Circuit Judges.

SNEED, Circuit Judge:

Debtor Philip Rubin appeals from the determination, by a bankruptcy court and bankruptcy appellate panel (BAP), that Hugh and Yasue West's $125,000 judgment against him is not dischargeable under 11 U.S.C. § 523(a)(2)(A) (Supp. V 1987). Although the Wests obtained the judgment by settling an action for fraud against Rubin, Rubin now denies that he acted fraudulently. We affirm.

## I.

### FACTS AND PROCEEDINGS BELOW

This is a story of Debtor Rubin's abuse of the Wests that we hold amounted to fraudulent conduct. It began in 1969 when the Wests purchased a house in San Diego with a Veterans Administration (VA) loan. By the start of 1976, the house had an appraised value of $38,000, but was encumbered by two deeds of trust. The deeds of trust secured $19,000 remaining on the Wests' original loan and $5,900 remaining on a second loan. This left the Wests with about $13,000 in equity. Although Mr. West at the time was earning $924 per month at the National Steel Company and

was receiving $474 per month in military retirement pay, the Wests had defaulted on the debt secured by the second deed of trust. As a consequence, they faced the possibility of losing the house in a foreclosure scheduled for February 18, 1976.

At this point Debtor Rubin enters the picture. The Wests had failed to find a commercial lender or relative to help them avert foreclosure. Rubin, after discovering a notice of default recorded on the Wests' property, contacted them. They went to see him on February 11, 1976. Rubin, who did business as the San Diego Loan Corporation, had a real estate broker's license and had spent approximately fourteen years dealing with people facing foreclosures. Rubin told Mr. West that there was not enough time to obtain a loan to refinance the second deed of trust and that, as a consequence, the Wests had no choice but to sell the house to him or to someone else.

The Wests, who had never owned another house and who had no experience in real estate, were reluctant and at first refused to sell. Rubin persisted, however, and eventually persuaded them to agree to a deal in which he would buy the house for $4,000 but rent it back to them for $350 per month. The deal provided further that Rubin would give the Wests an option to repurchase the house for $38,000 and that he would help them obtain financing so that they could exercise this option. Even had Rubin adhered to this bargain his potential profit would have been very substantial. He did not so adhere, however.

On February 17, 1976, the Wests gave Rubin a deed to the house, and Rubin immediately paid off the debt secured by the second deed of trust. Despite his statement to Mr. West about there not being enough time to borrow money to avert the Wests' foreclosure, Rubin himself quickly used the house to obtain significant funds after acquiring ownership. Thus, on February 18, 1976, Rubin gave Myrtle Brown a new deed of trust on the property in exchange for a $6000 loan. Six days later, on February 24, 1976, Rubin obtained an additional $7,000 from the Snodgrasses with

documents allowing him to characterize the transaction either as a sale of the house or as a loan secured by another deed of trust. Finally, Rubin never paid the Wests the entire $4000 they had agreed upon, although he did credit them $1050 for three months' rent.

The Wests' predicament then worsened. In May 1976, Rubin told the Wests that a federal regulation prevented them from repurchasing the home with a VA or Federal Housing Administration (FHA) loan within one year of its sale. The Wests, to preserve any hope of repurchasing the property, continued making payments on the first deed of trust. In November 1976, the Snodgrasses recorded their deed to the house.

In February 1977, the Wests sued Rubin in state court claiming damages for fraud and other tortious conduct. While their action was pending, several important events occurred. In March 1977 and March 1978, Rubin sued to evict the Wests in two separate municipal courts. Rubin lost the first suit but won the second by default. To achieve this victory, Rubin, although he allegedly knew that the West's had retained local counsel and temporarily had gone abroad in connection with Mr. West's work, served the Wests by publication to which they never responded. When the Wests returned to the United States in June 1978, they found themselves evicted. In July 1978, the Snodgrasses deeded the property back to Rubin. Rubin further encumbered the property with additional secured loans. In 1981, however, Rubin transferred the property to his creditors.

The Wests never regained possession of the house, but they did taste sweet revenge. The jury in the Wests' action against Rubin for fraud awarded them $90,000 in compensatory damages and $500,000 in punitive damages. The trial court granted Rubin a new trial on the basis of passion and prejudice shown by the jury. On February 28, 1982, immediately before the new trial, the Wests settled for $125,000. Rubin promptly filed a chapter 7 bankruptcy petition.

In May 1983, the Wests filed a complaint in the bankruptcy court to determine the dischargeability of the $125,000 settlement debt. On May 20, 1987, the bankruptcy court, after finding the facts discussed above, held that the debt was not dischargeable under 11 U.S.C. § 523(a)(2)(A) because it had resulted from Rubin's fraud. On June 23, 1988, the BAP affirmed the bankruptcy court in a memorandum decision. Rubin timely appealed to this court.

## II.

## JURISDICTION

The bankruptcy court had jurisdiction to determine the dischargeability of Rubin's debt under 28 U.S.C. § 157 (Supp. IV 1986). The BAP had jurisdiction to review the bankruptcy court's decision under § 158(b). We have jurisdiction under § 158(d).

## III.

## STANDARDS OF REVIEW

▮ The parties agree that this court, like the BAP, must review de novo all questions of law but must uphold the bankruptcy court's findings of fact unless they are clearly erroneous. *See Briney v. Burley (In re Burley)*, 738 F.2d 981, 986 (9th Cir.1984). They disagree, however, about whether Rubin's appeal raises issues of law or fact with respect to the bankruptcy

court's determination of his intent and its finding of proximate causation. Rubin contends, as noted below, that he did not act with the intent to defraud or deceive the Wests. This court expressly has decided that, at least for the purposes of determining the availability of a discharge in bankruptcy, a finding of intent to defraud a creditor is a finding of fact. *See First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir.1986). This court, moreover, will not overturn a finding of proximate causation unless it is clearly erroneous, even though the finding may depend to some extent upon law. *See Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1351 (9th Cir.1985).

## IV.

## ANALYSIS

The parties and the lower courts in this case have analyzed the dispute under 11 U.S.C. § 523(a)(2)(A) (Supp. V 1987) (footnote omitted), which provides:[1]

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

   .    .    .    .    .

(2) for money, property, or services, or an extension, renewal, or refinance of credit to the extent obtained by—

---

1. One might question whether § 523(a)(6) (1982) instead of § 523(a)(2)(A) should govern this case. The paradigmatic case for § 523(a)(2)(A) seems to arise when a debtor lies to a creditor to obtain a loan and the creditor seeks repayment of the loan in bankruptcy. *See, e.g., Eagle Nat'l Bank v. Lacey (In re Lacey)*, 85 B.R. 908, 910 (Bankr.S.D.Fla.1988) (holding nondischargeable a creditor's claim for money extended to a debtor who had induced the loan with bad checks). The paradigmatic case for § 523(a)(6), by contrast, seems to arise when a debtor intentionally injures a creditor and the creditor seeks to make nondischargeable a judgment that he has won in a state court tort action. *See, e.g., Clemens v. Cobley (In re Cobley)*, 89 B.R. 446, 451–53 (Bankr.E.D.Pa.1988) (holding nondischargeable a creditor's judgment against a debtor who beat him with a broomstick).

The Wests, in this suit, do not seek merely the return of the equity in their home (approximately $13,000), but instead want to enforce a settle-

ment agreement for a much greater sum that they obtained in a suit for the intentional tort of fraud. Some courts have held that § 523(a)(2)(A) does not permit recovery in excess of the actual value of the money or property obtained by fraudulent representations. *See Check Central, Inc. v. Barr (In re Barr)*, 54 B.R. 922, 924 (Bankr.D.Or.1984); *Record Co. v. Bummbusiness, Inc. (In re Record Co.)*, 8 B.R. 57, 60 (Bankr.S.D.Ind.1981). *But see Rasnick v. Carpenter (In re Carpenter)*, 17 B.R. 563, 564 (Bankr.E.D.Tenn.1982) (making punitive damages nondischargeable, but not discussing the issue). These courts might require the Wests to show the culpability required by § 523(a)(6) to make the entire $125,000 judgment nondischargeable; they would have to show, in particular, that the judgment resulted from a "willful and malicious" injury. We decline to decide the question, however, because Rubin has not raised the issue and because the settlement makes no distinction between actual and special damages.

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;....

Parsing this language into a more readable form and expanding it to incorporate the traditional definition of fraudulent misrepresentation, bankruptcy courts typically have asserted:

The elements of a claim for fraudulent misrepresentation under section 523(a)(2)(A) are: (1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, and (7) that damage proximately resulted from the misrepresentation.

*Mortgage Guar. Ins. Corp. v. Pascucci (In re Pascucci)*, 90 B.R. 438, 444 (Bankr.C.D. Cal.1988) (citing cases). Applying this reformulation of the statutory language, we agree that the Wests should prevail.[2]

■ The Wests have satisfied the elements requiring a false representation of material fact by showing that Rubin made two false representations when they approached him for a loan. First, Rubin informed them that he did not have time to obtain a loan, when in fact he obtained a loan from Myrtle Brown. Second, Rubin stated that he would help the Wests repurchase the home, but he never did. Even though Rubin correctly can characterize the first representation as a mere opinion, the Wests nevertheless should prevail. "[O]pinions as to future events which the declarant does not, in fact, hold or declarations made with reckless indifference for the truth may be found to be fraudulent." *Chase Manhattan Bank v. Fordyce (In re Fordyce)*, 56 B.R. 102, 105 (Bankr.M.D.Fla. 1985). Moreover, even though Rubin can

characterize the second representation as a promise, a promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A). *See id.* Both misrepresentations were material.

■ Rubin also intended to deceive the Wests. Although Rubin correctly points out that he told the Wests repeatedly and clearly that he could do nothing for them as a loan broker and that he intended to buy the property, his other representations reveal his intent to deceive. *See First Nat'l Bank v. Kimzey (In re Kimzey)*, 761 F.2d 421, 424 (7th Cir.1985) (holding that a court may infer an intent to deceive from a false representation). Rubin, moreover, must have known from his long experience in dealing with persons in similar situations that he could deceive the Wests; he must have known that, one week before the foreclosure, they would rely on his statements and follow his suggestions. Rubin's realization of substantial profit on the Wests' home while ignoring their legitimate interests also strengthens the finding that Rubin intended to defraud the Wests.

■ The Wests have shown reasonable reliance. They point out that: (1) they had no experience in real estate or finance; (2) Rubin had experience and a real estate broker's license; (3) Rubin was knowledgeable as his dealings show; (4) Rubin contacted the Wests and told them that he could help them; and (5) Rubin operated as a company whose name gave the impression that it made loans. While many would not have followed Rubin's advice, these facts show that the Wests, given their level of financial skills, listened to Rubin and did not act in an unusual or unreasonable manner.

---

**2.** Numerous bankruptcy courts have required creditors to prove the elements of § 523(a)(2)(A) by clear and convincing evidence. *See Pascucci,* 90 B.R. at 444 (citing cases). We express no opinion on the correctness of these decisions here because the Wests have shown such evidence in any event. At least one circuit, moreover, recently has held that actual rather than reasonable reliance suf-

fices. *See Thul v. Ophaug (In re Ophaug),* 827 F.2d 340, 343 (8th Cir.1987). Other circuits disagree. *See, e.g., Coman v. Phillips (In re Phillips),* 804 F.2d 930, 933 (6th Cir.1986); *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986); *First Nat'l Bank v. Kimzey (In re Kimzey),* 761 F.2d 421, 423 (7th Cir.1985). We also do not decide this issue because the Wests have shown reasonable reliance.

The Wests, finally, have shown proximate causation. On this issue, however, Rubin makes three contentions worth discussing. First, he argues that the Wests had not and could not obtain loans elsewhere and thus were going to lose the house anyway. This is equivalent to saying that the financially stricken deserve no protection from fraud when in fact it is they who need such protection most. Second, he argues that he had no duty to give the Wests a loan. True, but he had a duty to refrain from fraud. Third, he argues that even though he immediately encumbered the house, he could have sold it back to the Wests if they had obtained financing. Again true, but they could not, as Rubin himself points out, and the circumstances strongly suggest that he was not interested in reselling to the Wests. The Wests contend that, in the absence of Rubin's fraud, they would not have entered the deal, and that with a full seven days to look for a loan, they could have paid off the second deed of trust. Perhaps so, but the nondischargeability of this debt does not turn on that remote contingency. It turns on Rubin's fraudulent conduct. Thus we cannot say that the bankruptcy court erred in deciding against Rubin.

In sum, the bankruptcy court correctly found fraud in the entire course of proceedings between Rubin and the Wests. Rubin, with respect to the debt in question, does not fall within that class of debtors the bankruptcy laws are designed to assist. *See Brown v. Felsen,* 442 U.S. 127, 128, 99 S.Ct. 2205, 2207–08, 60 L.Ed.2d 767 (1979).

AFFIRMED.