In re Arlington Duane FELTON, Doris Ann Felton, aka dba Humphrey Mortgage and Investment, Debtors.

Mary GRIFFIN, Plaintiff/Respondent,

v.

Arlington Duane FELTON,
Defendant/Appellant.

Nos. C–95–3035 WHO, 93–36865 NT.
Adv. No. 94–4066 AN.

United States District Court,
N.D. California.

May 23, 1996.

Daniel A. Gamer, Daniel A. Gamer Law Offices, San Rafael, CA, David C. Winton, David Winton Law Offices, San Rafael, CA, for Mary Griffin.

Irving C. Kornfield, Howard Rutten, Kornfield, Paul & Bupp, Oakland, CA, for Arlington Duane Felton.

## OPINION AND ORDER

ORRICK, District Judge.

In this Chapter 7 adversary proceeding to determine dischargeability pursuant to 11 U.S.C. §§ 523(a)(2) and 523(a)(6), appellants/debtors/defendants Arlington Duane Felton and Doris Ann Felton aka dba Humphrey Mortgage and Investment (collectively "Felton") appeal the bankruptcy court's judgment of nondischargeability in the amount of $65,000 compensatory damages and $65,000 punitive damages in favor of respondent/plaintiff Mary Griffin ("Griffin"). Felton's appeal having come before the Court on December 21, 1995, and the Court having considered the pleadings, the record on appeal, and having had the benefit of oral argument of counsel, and for the reasons hereinafter set forth, the Court affirms in part and reverses in part the decision of the bankruptcy court.

### I.

#### A.

The following facts are summarized from the bankruptcy court's Findings of Facts, Opinion and Conclusions of Law ("Findings") filed on May 8, 1995.

Joyce and Charles Griffin ("Joyce and Charles") owned a home located at 2823 Center Avenue, Richmond, California 94804. Joyce was a homemaker, except for occasional babysitting jobs, and Charles owned Griffin and Son Trucking, a sole proprietorship. In 1989, Joyce and Charles filed a Chapter 13 bankruptcy proceeding as a result of foreclosure proceedings instituted against their home. Humphrey Mortgage Inc. ("HMI") was among many companies who sent them mail offerings to lend them money.

HMI is a corporation that was formed to make private lender loans, facilitate real estate sales, and provide loan servicing. As of October 1990, Duane Felton was a ninety percent shareholder and president of HMI. He was also responsible for making most of HMI's loan approval decisions.

Early in 1989, two agents from HMI, Wilma and Jamie, came to Joyce and Charles' home where they discussed a loan, the existing financing on the home, and the pending foreclosure proceedings. Wilma appraised the home for $145,000.

Val Altimare, an agent of HMI, subsequently called Joyce and Charles to arrange a meeting at their home to discuss the potential loan. A loan application was filled out at that meeting, but several days later Altimare called Joyce and Charles to inform them that the loan could not be made because the house was short $10,000–$12,000 in equity. Altimare asked if there was someone else who could co-sign the loan for that amount of money only. Another meeting at Joyce and Charles' home occurred, attended by Altimare, appellant Duane Felton, Joyce and Charles, and Charles' mother, respondent Griffin.

Griffin is sixty-nine years old, has a fourth grade education, is nearly illiterate, and has poor and failing eyesight. Her home at 210 Auburn Street, San Rafael, California, is her sole asset.

Felton asked Griffin if she would co-sign the loan for Joyce and Charles. He promised that her exposure would not exceed $12,000, and that she would not lose her home. There was no discussion of pledging Griffin's home as collateral for the loan. Felton knew that Griffin was barely literate and financially unsophisticated, and that her home was her only asset.

Two months later, a third meeting occurred at HMI to close the loan. Joyce and Charles, Griffin, HMI agents, and Felton were present. Documents were presented in assembly line fashion for Griffin and Joyce and Charles to sign, without any explanation of the documents, the potential for foreclosure, the balloon payments, the interest rate, the declining real estate market, prudence of seeking legal counsel, or the potential for refinancing. Griffin signed the documents without knowledge of the documents' contents. One of the documents she signed was an installment note secured by a deed of trust on her home in San Rafael, which obligated her to pay $87,000. The annual percentage rate on the loan was 22.244 percent.

The secured obligations against Joyce and Charles' home totalled $144,000. Joyce and

Charles could make only one payment on their $87,000 loan, and so HMI instituted foreclosure proceedings. HMI also served as real estate broker, listing the house for $165,000, which was $20,000 more than its appraised value. When the house did not sell, HMI put it up for foreclosure sale.

Before it was sold, Altimare suggested that Joyce and Charles take out a second loan with HMI, despite the fact that Joyce and Charles were in arrears by $12,000 on the first loan. HMI loaned them an additional $30,000, with Griffin co-signing, at an annual interest rate of 27.716 percent. The documents were again signed in assembly line fashion. There was no discussion of the contents of the documents, and no disclosures were made to the signors as to the potential risks of the transaction. Once this second loan was made, the secured obligations against Joyce and Charles' property were more than $170,000, and Griffin became liable for $121,000 in balloon payments due in July 1992. HMI, serving as escrow agent, received a deed of trust securing the $30,000 loan on Griffin's residence, contrary to the escrow instructions.

Despite Felton's earlier representations to Griffin, HMI proceeded to foreclose simultaneously on Joyce and Charles' home and on Griffin's home. HMI recorded a deed of trust on Griffin's home without an authorized escrow instruction.

Griffin filed an action in the Superior Court for the County of Marin ("Marin Action"), seeking to enjoin the sale and to recover damages. That action was stayed as to Felton and HMI when they filed for bankruptcy, but continued as to the lenders. Griffin settled with the lenders, agreeing to have a $65,000 deed of trust placed against her property in exchange for mutual releases.

### B.

On February 14, 1994, Griffin filed a complaint in bankruptcy court, alleging that Felton's actions constituted fraud. As such, any judgment rendered on the bankruptcy complaint would be nondischargeable under 11 U.S.C. § 523(a)(2). After a two-day trial, held on February 27 and March 6, 1995, the bankruptcy court found that Felton's conduct met the definition of fraud under § 523(a)(2), and of willful and malicious injury under § 523(a)(6). The bankruptcy court awarded Griffin $65,000 in compensatory damages, and $65,000 in punitive damages, and held that the award was a nondischargeable debt of Felton. "Seldom has the undersigned been confronted with a more blatant, outrageous fraud than that perpetrated on Mary Griffin in this case." (Findings at 13.)

### C.

Felton appeals this judgment based on the following arguments: (1) Griffin released Felton from all liability; (2) Felton is not liable under § 523(A)(2)(A) because he did not receive any money, property or services from Griffin and he made no misrepresentations; (3) Felton is not liable for malicious injury under Bankruptcy Code § 523(A)(6) because he didn't commit a wrongful act, his conduct was not malicious, and the bankruptcy court's finding that Felton set out with the intent to cheat Griffin out of her home is clearly erroneous factually; (4) the proximate cause of damages to Griffin was Joyce and Charles' failure to pay and not Felton's conduct; and (5) the award of compensatory and punitive damages was improper.

### II.

### A.

In an appeal of a decision of the bankruptcy court, the district court reviews issues of law *de novo*. *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir.1986).

The bankruptcy court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Bankr. Rule 8013. A factual finding is clearly erroneous when, even though there is evidence to support it, the reviewing court, based on all the evidence, is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). Bankruptcy Rule 8013

accords to the findings of a bankruptcy judge the same weight given the findings of a district court judge under Rule 52 of the Federal Rules of Civil Procedure. Bankr. Rule 7052.

■ A more deferential standard of review is applied to a bankruptcy court's decision on dischargeability. "Because the right to a discharge is a matter generally left to the sound discretion of the bankruptcy judge, we disturb this determination only if we find a gross abuse of discretion." *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401 (9th Cir.1990) (quoting *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir.1984).)

### B.

■ Felton's first argument is that Griffin released Felton from all liability when she settled her Marin Action for fraud. Felton contends that although he is not mentioned by name in the settlement agreement, the language of the agreement is broad enough to reach Griffin's claims against him. The bankruptcy court rejected this argument at trial, but did not address it in its written opinion.

Plaintiff's Exhibit 20 in the bankruptcy court proceeding was a "Settlement Agreement and Release" ("Release") signed sometime in 1994. The first two paragraphs of the Release states that it:

is entered into by and among plaintiffs, Mary Griffin ... and defendants Marjorie Anguiano, Joanna A. Frank, William Robert Kelly, Nancy Kelly, Norma D. Scarlett, Donald L. Bloodgood, Jackie C. Duarte, Todd Swalley, George Canessa, Norman Duncan and Judith L. Duncan (hereinafter collectively referred to as "Beneficiaries"), parties in Civil Action No. 156782 in the Superior Court for the County of Marin, State of California (hereinafter the "Action").

The undersigned parties have agreed to fully and completely resolve all differences with respect to the Action under the above-referenced case number, and as parties to the aforementioned Action, now desire to settle their disputes with, and to the

end that no further claims, controversies or litigation involving the parties hereto and arising from the Action may, or can, arise in the future, hereby execute the Agreement. The Agreement is to be construed as a full and final compromise and settlement of past and present claims, controversies and disputes between these parties.

The only named defendants in the Marin Action that are not named in the Release are HMI and Felton.[1]

Felton argues that, although he is not named in the Release, he is released from any liability to Griffin in Article 3 of the Release, which is entitled "General Release." In paragraph 3.1, the Release provides:

Mary Griffin ... hereby release[s] and discharge[s] [the Beneficiaries] *and their ... agents, predecessors,* ... from any and all ... obligations, losses, costs, expenses, attorneys' fees, liabilities and indemnities of any nature whatsoever, whether based on contracts, torts, statute or other legal or equitable theory of recovery, whether known or unknown, of any type or character whatsoever, insofar as any of the same relate to, arise out of, or could relate to or could arise out of the facts and circumstances, either pleaded or not, giving rise to the action referred to above.

(Emphasis added.) Paragraph 3.3 provides:

The general release set forth above specifically includes any and all claims, demands, obligations and, or, causes of action, compensatory and, or, exemplary damages and, or, other relief relating to or in any way connected with the subject matter of the action, whether or not known or suspected to exist and whether or not specifically or particularly described herein.

Paragraph 3.4 provides:

The parties, and each of them, expressly waive any right or claim of right to assert hereafter that any claims, demands, obligations and, or, causes of action, which are

1. A copy of the complaint in that matter was introduced as defendants' Exhibit AH.

covered by Article 2 hereof,[2] has, through ignorance, oversight or error, been omitted from the terms of this Agreement, and further, expressly waive any right or claim that they may have under the law of any jurisdiction that releases such as those here given do not apply to unknown or unstated claims. It is the express intent of each party to this Agreement to waive any and all claims covered by Article 2 hereof, that they have against each other, including any which are presently unknown, unsuspected, unanticipated or undisclosed. All parties hereto expressly waive the provisions of section 1542 of the Civil Code of California which provides:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor."

(Footnote not in original.)

Felton argues that he is an agent of the beneficiaries and, thus, falls within the general release of paragraph 3.1, even though he is not mentioned by name. Paragraph 6 of the verified complaint in the Marin Action alleges that "[a]t all times mentioned herein, each of the defendants was the agent and employee of the remaining defendants and was, in doing the things complained of herein, acting within the scope of such agency and employment." At trial, Felton testified that he and HMI were the agents of the lenders, as well as of Griffin. (Transcript of Trial Proceedings ("Tr.") 356:5–13, 382:6–383:13.) The bankruptcy court rejected these same arguments, on the grounds that, at most, HMI was the agent, not Felton. (Tr. 92:13–96:18.) The bankruptcy court held that the Release did not apply to Felton. (*Id.*)

Griffin points to other language in the Release, which she argues shows that the Release unambiguously released only the beneficiaries, and not HMI or Felton. Griffin first points to the first paragraph of the

Release, which lists the parties to the Release, and does not include HMI or Felton. In the second paragraph, as quoted above, the Release is a settlement of claims between "these parties." In paragraph 3.1, the parties to be released by Griffin are listed by name; Felton and HMI are not included. In paragraphs 2.1.b and 5.1, Griffin agrees to dismiss the Action as to "Beneficiaries," who are defined in the first paragraph of the Release not to include HMI and Felton. Finally, paragraph 6.1 of the Release provides:

This Agreement shall be binding on and inure to the benefit of the successors and assigns of the parties hereto. Nothing in this Agreement, express or implied, is intended to confer upon any person other than the parties hereto or their respective successors and assigns, any rights or benefits under or by reason of this Agreement.

Griffin argues that the identification of the beneficiaries by name and the language of paragraph 6.1 conclusively establish that Felton was not an intended beneficiary of the Release.

The Release is subject to the same principles of interpretation as any other contract. *Winet v. Price*, 4 Cal.App.4th 1159, 1165, 6 Cal.Rptr.2d 554, 557 (1992). Under those principles, parol evidence is admissible only if the contract terms are ambiguous. *Id.* The threshold determination of whether the contract language is ambiguous is a question of law. *Id.* To determine whether the language of the release is ambiguous, the Court provisionally admits all credible parol evidence to determine whether the language is reasonably susceptible to the interpretation urged by Felton. *Id.* If the Court finds that the language is reasonably susceptible to the interpretation urged by Felton, the Court will admit the extrinsic evidence to interpret the language of the Release. *Id.* When the parol evidence is not conflicting, or where no parol evidence is introduced, construction of the Release is a question of law, and the

---

**2.** Article 2 of the Release provides that Griffin will execute a note and a deed of trust in the amount of $65,000, payable to the beneficiaries on her death, her permanent departure from her San Rafael property, or on default on prior encumbrances on the property. Griffin also agrees to dismiss the Marin Action with prejudice against the beneficiaries. The beneficiaries agree to release Griffin, and Joyce and Charles, with respect to any obligation due on either of the two loans executed in favor of HMI by Joyce and Charles and Griffin.

appellate court will independently construe the writing. *Id.*, 4 Cal.App.4th at 1166, 6 Cal.Rptr.2d at 557.

Here, neither side has provided any parol evidence as to the intent of the drafters of the Release. Where there is no parol evidence of intent, the Court may consider parol evidence of the circumstances that attended the making of the agreement, so that the Court can place itself in the same situation in which the parties found themselves at the time of contracting. *Id.*, 4 Cal.App.4th at 1168, 6 Cal.Rptr.2d at 559. Griffin testified in the bankruptcy proceedings that she was represented by counsel when the Release was signed, and that she signed it after counsel read the Release and explained it to her. (Tr. 58:2–21.) The Court has previously noted that of the defendants in that Action, only HMI and Felton are not included in the Release.

HMI and Felton are at the very heart of this dispute. Griffin filed the Marin Action against them as well as against the beneficiaries. Under these circumstances, the Court finds it unlikely that a Release that scrupulously avoids mentioning HMI and Felton by name was intended by the parties to release HMI and Felton from all liability.

The Court does not find the cases cited by Felton to be dispositive. In *General Motors Corp. v. Superior Court*, 12 Cal.App.4th 435, 443, 15 Cal.Rptr.2d 622, 627 (1993), a general release of "all other persons, firms and corporations" was held to apply to a third party not named in the release. In *Lama v. Comcast Cablevision*, 14 Cal.App.4th 59, 64, 17 Cal.Rptr.2d 224, 226 (1993), a similarly broad release of "any other person, corporation, association or partnership" was held to apply to a third party not named in the release. There is no such broad release at issue here. In fact, the Release repeatedly limits settlement to specific parties. *See, e.g.*, the first two unnumbered paragraphs, and paragraph 6.1.

The Court instead is persuaded by the logic of a case cited by neither party, *Appleton v. Waessil*, 27 Cal.App.4th 551, 32 Cal. Rptr.2d 676 (1994). In that case, the issue before the court was whether a general release of two named defendants and "all other persons, firms, associations and corporations" was intended to apply to a third defendant. The court looked at extrinsic evidence of the complaint, and plaintiff's dismissal with prejudice of only the two named defendants, among other things, and reversed summary judgment for the third defendant, finding a triable issue of fact as to whether the release was intended to apply to the third defendant. The court reasoned:

> If it was the intent of the parties to release respondent, one has to wonder why such an important player in the cast of characters was not specifically named in the document. The simple fact that respondent was not named created an apparent ambiguity. The extrinsic evidence provided by appellant tended to show that the intent of the parties was not to include respondent in the settlement.

*Id.*, 27 Cal.App.4th at 555–556, 32 Cal. Rptr.2d at 678.

As in *Appleton*, the Court finds that the fact that Felton was not named in the Release created an apparent ambiguity. Upon conditionally examining the parol evidence of the surrounding circumstances of the settlement embodied in the Release, however, the Court finds that the language of the Release is not reasonably susceptible to Felton's interpretation. In particular, the Court notes that although HMI and Felton were parties to the Marin Action, Griffin agreed to dismiss the Action only as to the beneficiaries, and not as to HMI and Felton. (*See* Release, ¶ 2.1.b.) Felton has submitted no parol evidence to the contrary. Thus, the Court finds, as a matter of law, that the Release did not constitute settlement of any of Griffin's claims against Felton.

## C.

The Court now turns to whether the bankruptcy court's finding of nondischargeability under 11 U.S.C. § 523(a)(2) was proper. Section 523(a)(2)(A) provides that:

> A discharge ... does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a

false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

The Ninth Circuit's five step-test for finding a violation under § 523(a)(2)(A) for misrepresentations requires that Griffin show that: (1) Felton made the representations; (2) he knew they were false when he made them; (3) he made them with the intention and purpose of deceiving Griffin; (4) Griffin relied on such representations; and (5) Griffin sustained the alleged loss and damage as the proximate result of the representations having been made. *Britton v. Price* (*In re Britton*), 950 F.2d 602, 604 (9th Cir.1991).

For the purposes of this appeal, Felton makes three arguments: (1) he received no money, property, or services from Griffin; (2) he made no misrepresentations to her; and (3) any loss Griffin suffered was not proximately caused by anything Felton did.

1.

The bankruptcy court held that Felton indirectly benefited, as a ninety percent shareholder in HMI, from the commissions generated by the loans, and the high interest rates on the loans, and that this level of involvement meets the test of *Arm v. Morrison* (*In re Arm*), 175 B.R. 349, 353 (9th Cir. BAP 1994). (Findings at 9.) In *Arm*, the Ninth Circuit Bankruptcy Appellate Panel held that a debt can be nondischargeable under § 523(a)(2)(A) even when the debtor did not personally obtain money, property, or services, where the debtor indirectly benefited from his or her fraudulent conduct. (*Arm*, 175 B.R. at 353).

Felton argues at length that he did not receive money personally from the Griffin loan transaction. It is not necessary, under *Arm*, that he do so, as long as he indirectly benefited from the transaction. The evidence does not show that HMI operated as a nonprofit, charitable organization. Felton's apparent denial that he and HMI received any financial benefit from the loans they orchestrated is absurd. Felton testified that HMI received a loan origination fee for the loans that it arranged.

In this case, the bankruptcy court found that Felton's stake in HMI was sufficient to meet the indirect benefit test of *Arm*. This Court sees no reason to reverse the bankruptcy court on this issue, given that Felton was a fifty percent shareholder in HMI at the time of the first loan, and owned ninety percent of HMI at the time of the second loan.

2.

Felton's argument that he did not make any fraudulent misrepresentations is similarly meritless. The bankruptcy court held that "the nature of Felton's misconduct . . . plainly meets all three species of fraud as set forth in § 523(a)(2)." (Findings at 11:4–6.) Felton testified at trial that he promised Griffin that she would not lose her house; that if foreclosure became necessary, HMI would foreclose first on Joyce and Charles' house; and that if HMI foreclosed on Joyce and Charles' house, Felton would seek to obtain additional financing for Griffin's house so that it would not be necessary to foreclose on her home. Not one of these promises was kept. The bankruptcy court found that Felton intended to deceive her, that Griffin had no reason to disbelieve him, and that the result was the loss of her house. This court agrees with the bankruptcy court that nothing more is needed to establish a false representation under § 523(a)(2). *Rubin v. West* (*In re Rubin*), 875 F.2d 755, 759 (9th Cir. 1989); *Britton*, 950 F.2d at 604.

Section 523(a)(2) also clearly contemplates that fraud can occur without overt misrepresentations, by providing that a debt is nondischargeable when obtained by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). A false pretense involves an implied misrepresentation, or conduct intended to create or foster a false impression, and can include a "mute charade," where the debtor's conduct is designed to convey an impression without oral representation. *Germain Lincoln Mercury v. Begun* (*In re Begun*), 136 B.R. 490, 494 (Bankr.S.D.Ohio 1992). This Court does not find clearly erroneous the bankruptcy court's finding that no disclosures were made about the consequences and risks of either loan. Felton thus silently encouraged Griffin to

believe that she was helping her son to save his house without incurring any risk to her own home.

The Court finds that the conclusion of the bankruptcy court is supported by the evidence presented at trial, and is not a gross abuse of discretion. Felton has submitted no reason why the bankruptcy court's findings of fact on this issue were incorrect.[3]

### 3.

Finally, Felton's proximate cause argument is unconvincing. Felton argues that Griffin's troubles were not caused by any act of HMI or Felton, but were caused by Joyce and Charles' failure to make payments on the loans. Had Felton not lured Griffin into co-signing the loan for Joyce and Charles, the loan would not have closed. Had the loan not closed, there would never have been a foreclosure of Griffin's home. "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Britton,* 950 F.2d at 604, (*quoting* W. Page Keaton et al., *Prosser and Keaton on The Law of Torts* § 42 at 273 (5th ed. 1984)). It is hornbook law that there can be more than one proximate cause of an event. The bankruptcy court's conclusion that Felton's fraud caused Griffin's foreclosure is not clearly erroneous.[4]

### D.

Felton also argues that the bankruptcy court improperly held that his actions constituted willful and malicious injury to Griffin under 11 U.S.C. § 523(a)(6). Section 523(a)(6) provides that "[a] discharge ... does not discharge an individual debtor from any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." The Ninth Circuit has held that to prove a "willful" injury, Griffin must show that Felton intended to do the act at issue, but not that the Felton

intended to injure her. *Britton,* 950 F.2d at 605. To prove that the injury was malicious, Griffin must show Felton's actual knowledge, or reasonable foreseeability, that his conduct would result in injury to her. *Id.* Thus, an intentional act that necessarily produces harm is willful and malicious even without an intent to injure. *Impulsora Del Territorio Sur v. Cecchini (In re Cecchini),* 780 F.2d 1440, 1443 (9th Cir.1986).

Here, the bankruptcy court found that Felton intended to carry out the provisions of the loan agreement. The bankruptcy court also found that Felton knew, given Joyce and Charles' financial state and the terms of the loan, that it was inevitable that they would default and that Griffin's house would be claimed as collateral under the loan agreements. Indeed, the bankruptcy court concluded that the facts "establish not merely that Felton committed unexcused intentional acts that necessarily produced harm, but that he committed acts with the actual and calculated intent to injure the plaintiff." (Findings at 12.)

Felton testified that he knew, at the time of the first loan, that Joyce and Charles were in bankruptcy and that Charles was unemployed. He testified that it was nearly impossible for Charles to have met his balloon payment unless the value of the real estate increased substantially. He also testified that, at the time of the second loan, he knew that there was no equity left in Joyce and Charles' house, and that neither he nor anyone else at HMI told them. The bankruptcy court's conclusion that Felton's actions were willful and malicious was not clearly erroneous.

### E.

Felton argues that, even assuming liability to Griffin, the bankruptcy court's award of $65,000 in compensatory damages was improper. Felton argues that the $65,-

---

3. Felton's arguments about the allegedly questionable credibility of witnesses ignores the hornbook law that judging the credibility of witnesses is particularly within the province of the trial court. *See* Bankr.Rule 8013 ("due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses.").

4. Findings of proximate cause are reviewed under the clearly erroneous standard, even though the findings may depend to some extent upon law. *Britton,* 950 F.2d at 604.

000 figure was based on the settlement agreement between Griffin and the other lenders that provided for a $65,000 lien on Griffin's house in exchange for the lenders' release of Griffin *and* Joyce and Charles from liability. Felton argues that he should only be required to compensate Griffin, not Joyce and Charles.

This Court finds Felton's position most peculiar. It is clear that the loan would not have occurred but for Griffin's agreement to co-sign for Joyce and Charles. Felton's fraud caused Griffin to co-sign the loan. If there had been no loan, then, obviously, Joyce and Charles could not have defaulted on that loan. Felton's fraud was a proximate cause of Joyce and Charles' liability to the lenders of the HMI loans. Because the purpose of compensatory damages is to return the victims to the position they were in before the wrongdoing occurred, the bankruptcy court needed to return Griffin to the state in which her house was unencumbered, which required an award of $65,000.

### F.

■ Finally, Felton argues that the bankruptcy court improperly awarded Griffin punitive damages because no evidence of Felton's financial condition was introduced at the bankruptcy proceeding. The bankruptcy court acknowledged that both the Ninth Circuit and California courts consider the nature of the defendant's acts, the amount of the compensatory award, and the defendant's wealth in setting an award of punitive damages. (Findings at 13, (*citing Professional Seminar Consultants, Inc. v. Sino Am. Technology Exch. Council, Inc.,* 727 F.2d 1470, 1473 (9th Cir.1984)); *Burnett v. National Enquirer, Inc.,* 144 Cal.App.3d 991, 1010, 193 Cal.Rptr. 206 (1983)). Even though no evidence was presented at trial on the extent of Felton's wealth, the bankruptcy court awarded Griffin punitive damages of $65,000, because Felton "is presently gainfully employed and … his earnings ultimately may be sufficient to satisfy this judgment." (Findings at 13.)

■ Felton relies on *Adams v. Murakami,* 54 Cal.3d 105, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991), in which the California Supreme Court held that evidence of the defendant's financial condition is a prerequisite to an award of punitive damages, and that plaintiff bears the burden of introducing such evidence. *Id.,* 54 Cal.3d at 108–09, 284 Cal.Rptr. at 319, 813 P.2d at 1349–50. Punitive damages are imposed to deter future misconduct by the defendant. *Id.,* 54 Cal.3d at 110, 284 Cal.Rptr. at 320, 813 P.2d at 1350. In order for the reviewing court to determine whether the amount of punitive damages exceeds the level necessary to properly punish and deter, the reviewing court must consider the award in light of the financial condition of the defendant. *Id.* "Deciding in the abstract whether an award is 'excessive' is like deciding whether it is 'bigger,' without asking 'Bigger than what?'" *Id.,* 54 Cal.3d at 110, 284 Cal.Rptr. at 320–21, 813 P.2d at 1350–51. "A reviewing court cannot make a fully informed determination of whether an award of punitive damages is excessive unless the record contains evidence of the defendant's financial condition." *Id.,* 54 Cal.3d at 110, 284 Cal.Rptr. at 321, 813 P.2d at 1351.

Here, the bankruptcy court acknowledged that no evidence was presented at trial as to Felton's wealth. The only such evidence presented was that Felton was employed at the time of the trial as a real estate broker. The bankruptcy court's conclusion that Felton's earnings ultimately "may be" sufficient to satisfy a $65,000 punitive damages award is inadequate justification for an award of punitive damages under *Adams.* Knowing that Felton is employed as a real estate broker does not provide this Court with enough information to determine whether an award of $65,000 in punitive damages was excessive.

■ Griffin argues that punitive damages are available, even in the absence of data on Felton's financial condition, under § 3345 of the California Civil Code, which provides:

> Whenever the trier of fact is authorized by a statute to impose either a fine, or a civil penalty or other penalty, or any other remedy the purpose or effect of which is to punish or deter, and the amount of the fine, penalty or other remedy is subject to the trier of fact's discretion … [w]henever the trier of fact makes an affirmative find-

ing in regard to one or more of the following factors, it may impose a fine ... in an amount up to three times greater than authorized by statute, or, where the statute does not authorize a specific amount, up to three times greater than the amount the trier of fact would impose ... (1) [w]hether the defendant knew or should have known that his or her conduct was directed to one or more senior citizens ... (2) [w]hether the defendant's conduct caused one or more senior citizens or disabled persons to suffer: loss or encumbrance of a primary residence ... (3) [w]hether [the senior citizen is] substantially more vulnerable than other members of the public to the defendant's conduct because of age, poor health....

This statute has not been cited in any reported decision. Nevertheless, the Court sees nothing in the language of this section that overrules *Adams*. Section 3345 authorizes punitive damages against parties engaged in unfair practices affecting senior citizens, in an amount up to three times that which would otherwise be awarded. Thus, once a determination has been made that punitive damages should be awarded, the statute acts only as a discretionary multiplier.

The Court is entirely sympathetic to the bankruptcy court's desire to award punitive damages against Felton, given the extent of his fraud upon Griffin. The Court, however, sees no way around the unequivocal language of the California Supreme Court. Because Griffin failed to introduce any evidence of Felton's wealth, the bankruptcy court's award of $65,000 in punitive damages was improper, and must be reversed.

### III.

Accordingly,

IT IS HEREBY ORDERED that:

1. The bankruptcy court's decision that Felton's actions constituted fraud under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6) is AFFIRMED.

2. The bankruptcy court's award to Griffin of $65,000 in nondischargeable compensatory damages is AFFIRMED.

3. The bankruptcy court's award to Griffin of $65,000 in nondischargeable punitive damages is REVERSED, due to Griffin's failure to introduce at trial any evidence of Felton's wealth.