**In re Jerry D. SMITH and Elaine R. Smith, Debtors.**

**Ian and Lily Bell, husband and wife; Dario and Cheryl Bell, husband and wife; David L. Leach, an individual; and Thomas J. Pacheco, an individual, Plaintiffs,**

v.

**Jerry D. Smith, a married individual, Defendant.**

**Bankruptcy No. 96–03202.
Adversary No. 97–6240.**

United States Bankruptcy Court,
D. Idaho.

Nov. 3, 1998.

David G. Ballard, Churchill Law Offices, Boise, ID, for Plaintiffs.

Harold Q. Noack, and T.J. Angstman, Boise, ID, for Defendant.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

### I. Background

Plaintiffs Ian, Lily, Dario, and Cheryl Bell (collectively "Bells"), David Leach ("Leach"), and Thomas Pacheco ("Pacheco") initiated this adversary proceeding against Defendant Jerry Smith, a Chapter 7 Debtor, seeking the Court's order that certain claims they allegedly hold against Defendant should be excepted from discharge under Section 523(a) of the Bankruptcy Code.

On August 20 and September 16, 1998, a trial on the matter was conducted. At trial, Defendant moved for judgment as a matter of law, which was granted with

respect to the claims of Leach, and denied as to Bells and Pacheco. Plaintiffs also withdrew their claims under Section 523(a)(6), electing to proceed under Section 523(a)(2)(A). At the conclusion of the trial, the issues were taken under advisement. This decision constitutes the Court's findings of fact and conclusions of law. F.R.B.P. 7052.

## II. Facts

Defendant Jerry Smith ("Smith") was the owner and President of Monterey Homes, Inc. ("Monterey"), a large residential construction enterprise, which entity in the late 1996 sold homes to Plaintiffs. Monterey filed for bankruptcy relief under Chapter 7 on December 5, 1996. Smith and his wife Elaine filed a joint petition under Chapter 7 on March 26, 1997. Smith was directly responsible for the day-to-day management of Monterey, reviewing financial records and documents on a regular basis, providing instructions to other employees, and making all major business decisions on behalf of the company. In particular, Smith supervised the receipt and disbursement of funds to subcontractors and suppliers on Monterey's many home construction contracts.

Bells and Pacheco purchased homes from Monterey. A written purchase agreement was executed in each case between the buyers and Monterey, signed by Smith, containing the following provision:

Title of seller is to be conveyed by Warranty Deed, unless otherwise provided, and is to be marketable and insurable . . . . Liens, encumbrances or defects to be discharged by seller may be paid out of purchase money at date of closing. No liens, encumbrances or defect, which are to be discharged or assumed by buyer or to which title is taken subject to, exists unless otherwise specified in this agreement. . . . liens, encumbrances or obligations assumed . . . shall be prorated as of closing.

Plaintiffs' Exhibit 108 and 154, at ¶ 12. Plaintiffs paid Monterey the necessary funds to close the transaction. Each received a Warranty Deed from Monterey signed by Smith. Bells' Warranty Deed provided that the "premises are free from all encumbrances, EXCEPT those to which this conveyance is expressly made subject and those made, suffered or done by the Grantee(s)." Plaintiffs' Exhibit 114.

In addition to the agreements Smith signed for Monterey with Plaintiffs, Smith also executed other documents in relation to Bells' home, including an indemnity agreement with First Security Bank containing a provision stating that "[a]ll labor and material used in the construction of improvements on the above described property have been paid for and there are now no unpaid labor or material claims against the improvements or the property . . . ." Plaintiff's Exhibit 111, ¶ 3. This indemnity was given by Monterey to the bank to facilitate Bells' financing.

During late 1996 and thereafter, Monterey suffered from a severe cash flow shortage. In attempting to cope with this continuing crisis, Smith, in operating Monterey, failed to pay subcontractors and suppliers who had performed work and provided materials in the construction of Plaintiffs' homes. Instead, Smith used the funds received from Plaintiffs to pay other Monterey expenses. After closing the sales with Plaintiffs, the unpaid subcontractors and suppliers filed statutory materialman's liens on Plaintiffs' homes amounting, eventually, to $22,713.45 and $15,009.79 for Bells and Pacheco respectively.

Plaintiffs argue that Smith, through false pretenses, false representations, or actual fraud, wrongfully used their house purchase proceeds to pay unrelated debts of Monterey, instead of using the funds to discharge the claims of Monterey's creditors attributable to building their houses. As a result, Plaintiffs assert their claims against Smith for breaching his promise that their homes would be "lien free" should be excepted from Smith's discharge

in bankruptcy under 11 U.S.C. § 523(a)(2)(A). Smith contends that it was at all times his intention to fulfill the obligations undertaken by Monterey contained in the executed documents. Smith explains that all funds received from Plaintiffs' home deals were disbursed in the ordinary course of his business operations, and not pursuant to any fraudulent scheme.

## III. Discussion

■ Section 523(a)(2)(A) excepts from discharge a debt obtained through "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To invoke the protections of this provision, a creditor must prove, by preponderance of the evidence, *see Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), that: (1) Defendant made representations; (2) which at the time Defendant knew were false; (3) Defendant made the representations with the intention of deceiving Plaintiff; (4) Plaintiff relied on such representations, and; (5) Plaintiff sustained the alleged loss as the proximate result of the representations. *American Express v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir.1996), cert. denied, 520 U.S. 1230, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997). It is a general rule that the principals of a corporation will be held responsible under Section 523 for frauds and intentional torts committed individually. *See In re Hawkins*, 92 I.B.C.R. 159, 161 (corporate veil did not preclude individual liability for torts committed by principal of corporation); *Alpine Packing Company v. H.H. Keim Company, Ltd.*, 121 Idaho 762, 763, 828 P.2d 325 (Ct.App.1991)("individual owners of corporations should not be allowed to commit fraud upon creditors by hiding behind the limited personal liability produced by incorporation").

### 1. False representations.

Smith made several significant representations to Bells: (1) "No liens, encumbrances or defects, which are to be discharged or assumed by Buyer or to which title is taken subject to, exist unless otherwise specified in this Agreement." Plaintiffs' Exhibit 108: Purchase and Sale Agreement, p. 2, ¶ 12; (2) the Escrow Closing Instructions provide that title to the property would vest in Bells free and clear of all encumbrances save any noted exceptions. Plaintiffs' Exhibit 109: Escrow Closing Instructions, ¶ 1; (3) that the "premises are free from all encumbrances, EXCEPT those to which this conveyance is expressly made subject...." Plaintiffs' Exhibit 114: Corporate Warranty Deed; and (4) "All labor and material used in the construction of improvements on the above described property have been paid for and there are now no unpaid labor or material claims against the improvements or the property...." Plaintiffs' Exhibit 111: Indemnity Agreement with First Security Bank, ¶ 3. All of these representations were made to Bells without any qualifications to the statements.

Similarly, Smith made the following representations to Pacheco: (1) "No liens, encumbrances or defects, which are to be discharged or assumed by Buyer or to which title is taken subject to, exist unless otherwise specified in this Agreement." Plaintiffs' Exhibit 154: Purchase and Sale Agreement, p. 2, ¶ 12; and (2) while a Warranty Deed, Plaintiffs' Exhibit 157, was executed between the parties without specific language regarding liens and encumbrances, a warranty deed is generally considered to contain a warranty of freedom from encumbrances. Once again, these representations were made without any express exceptions or limitations.

Do the representations made by Smith constitute "false representations" for purposes of Section 523(a)(2)(A)? At the time he made the promises to Plaintiffs, Smith admits knowing that outstanding supplier and subcontractor bills existed with respect to both homes. However, Smith provides several explanations for the rep-

resentations and why such should not be considered "false."

First, Smith asserts that the term "lien" as it is used in the documents refers only to liens of record. Since at the time of closing there were no liens of record on the homes, Smith reasons, the statements made concerning liens were not false.

■■■■ Under Idaho law, a person providing labor or materials in the construction of a building has a lien upon the property for the labor performed or the materials furnished. Idaho Code § 45–501. The mechanics' and materialmen liens "are creatures of statute, and statutory requirements must be substantially complied with in order to perfect a valid lien." *Baker v. Boren,* 129 Idaho 885, 934 P.2d 951, 961 (App.1997)(citing *Pierson v. Sewell,* 97 Idaho 38, 41, 539 P.2d 590, 593 (1975)). In order to perfect such a lien, Section 45–507 of the Idaho Code requires the lienholder to file a claim of lien within 90 days after providing labor or materials. Following the filing of a claim of lien, the lien is valid for six months. Idaho Code § 45–510. The statutes, when read together, clearly demonstrate that such a lien arises upon the performance of labor or the furnishing of materials, not when the claim of lien is recorded.

■■■■ Smith, who has significant building experience, was intimately familiar with the lien statutes cited above. While it is correct that at the time of closing there were no perfected liens, or liens of record, on the homes sold to Plaintiffs, Smith knew that some suppliers had not been paid and that these individuals or entities held unrecorded lien rights which could be perfected and enforced through foreclosure on the properties. Smith made no effort to inform Plaintiffs of the existing, but secret, lien rights against their homes or that such lien rights could later be perfected and enforced against the houses they were purchasing. The Court declines to accept Smith's assertion that his representations were limited to liens of record

in light of Smith's experience and understanding, and the other facts surrounding these transactions. Viewed reasonably, Smiths representations were false.

## 2. Intent to Deceive

■■■■ Intent to deceive is a question of fact which may be inferred from the surrounding circumstances of the case. *Cowen v. Kennedy (In re Kennedy),* 108 F.3d 1015, 1018 (9th Cir.1997). "A promise made with a positive intent not to perform or without a present intent to perform satisfies [Section] 523(a)(2)(A)," *McCrary v. Barrack (In re Barrack),* 217 B.R. 598, 606 (9th Cir. BAP 1998)(quoting *In re Rubin,* 875 F.2d 755, 759 (9th Cir. 1989)), as does a representation which the debtor knew or should have known was outside of the debtor's prospective ability to perform. *Id.* (citing *In re Firestone,* 26 B.R. 706, 715 (Bankr.S.D.Fla.1982)).

■■■■ According to testimony by Smith, in October 1996, when representations were made to Bells, Monterey's debt was approximately $3.5 million. In late November when representations were made to Pacheco, Monterey's debt was close to $4 million. Monterey had no reliable, existing source of funds to pay this debt. In other words, Smith made promises to Plaintiffs that bills related to their homes had been paid, when he knew or should have known, given his detailed knowledge of Monterey's dismal financial condition, that the company's ability to pay the outstanding bills was suspect. While Smith denies he intended not to perform, the record contains more than enough evidence to conclude that Smith should have known, given his financial condition at the time, that he did not have the prospective ability to pay the outstanding bills on Plaintiffs' homes.

As a defense to the allegation that he intended to deceive Plaintiffs, Smith asserts that it was his ordinary course of business to close on a house sale without having paid all the outstanding bills and claims related to the home construction.

Smith argues that in many instances final bills would not be submitted by subcontractors or suppliers until after the home transaction had closed. However, Smith also testified that he knew, once again given his experience in the industry and knowledge of his company's books and records, the approximate amount of each outstanding charge within a few dollars. Smith did not inform Plaintiffs of his business practice. Plaintiff Lily Bell testified that Bells would not have closed had they known there were unpaid bills. Sherri Grunder, former escrow officer at Alliance Title and the officer who closed the Bell home transaction, testified that she would not have closed the deal had she known that bills remained unpaid on that particular home. She further testified that, as an escrow officer, she relied on the representation that no liens or encumbrances existed as a statement of fact, not one of assumption. Similarly, Plaintiff Pacheco testified that he would not have purchased his home without the representations made in the Warranty Deed. Charlotte Oien, the escrow officer at Pioneer Title who closed the Pacheco deal, testified that the transaction would not have closed had she been aware of any unpaid claims for labor or materials unless Smith would have agreed to pay those bills out of his closing proceeds.

In both situations, the Court finds that had Smith explained his "ordinary" course of his business to the involved parties, particularly his practice of paying bills for labor and materials subsequent to closing, there is no question that arrangements would have been required to protect Plaintiffs, either by Plaintiffs themselves or by the title companies involved in the transactions. Smith was aware that by failing to reveal information which was different than that represented in the documents he had signed, false representations were made to both Bells and Pacheco with respect to liens and encumbrances on their properties.

As to these representations, Smith testified at trial that he knew that bills existed or would soon be sent to him that were not paid at the time of closing. Therefore, Smith knew at the time the relevant documents were signed that the representations therein, regarding liens and encumbrances on the properties, were false.

All facts and evidence considered, the Court finds and concludes that Smith intended to deceive Plaintiffs in these transactions as required by Section 523(a)(2)(A).

### 3. Reliance

The United States Supreme Court has construed the terms of Section 523(a)(2)(A) to require justifiable, not reasonable, reliance. *Field v. Mans*, 516 U.S. 59, 70–71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The Court instructs "that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that 'it is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Id.* at 71, 116 S.Ct. 437 (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971)). Here, the Court finds that there were no circumstances which would have served as a warning to Bells or Pacheco that they were being deceived. Even the professionals involved in closing the transactions, people involved in closing some thirty or forty home sales per month, had no suspicions of Smith's deceit from the facts placed before them. Plaintiffs had no special knowledge of the intricacies of lien rights or real estate closings. They had no legal or other advisor to help them. In sum, Plaintiffs, given their knowledge and intelligence, should not be expected to have discovered facts from the surrounding circumstances that would have prompted them to perform a more thorough investigation of Smith and his busi-

468

ness practices. Plaintiffs justifiably relied on Smith's representations that their homes would be free of any liens or encumbrances after closing.

### 4. Causation of Loss

 As a result of Smith's failure to pay outstanding claims against Plaintiffs' homes, several statutory liens were asserted against Plaintiffs' homes in the amount of $22,713.45 (Bells) and $15,009.79 (Pacheco). As explained above, the transactions would not have closed and Plaintiffs would not have acquired the properties had Smith's fraud been known to them or the title officers. Therefore, the false representations made by Smith were the proximate cause of any loss sustained by Plaintiffs in relation to discharging or contesting the liens on their properties. The amounts represented by these liens, and Smith's liability to Plaintiff on account of these charges, will be excepted from Debtors' discharge pursuant to Section 523(a)(2)(A).

Plaintiffs also seek to include attorney fees and cost of $12,555.05, plus interest, in the nondischargeable debt as further damages incurred as a result of Smith's conduct. These attorney fees and costs were incurred by Plaintiffs to their lawyer in defending against the lien claims and the lien foreclosure suits brought against Plaintiffs by Glenn Electric, Franklin Building Supply, Low's Ready Mix, and Nampa Floors.

Defendant disputes the reasonableness and amount of the fees and costs. At trial, Defendant argued that Plaintiffs' counsel was "over zealous" in defending the lien foreclosure actions and advanced needless defenses. However, after listening to testimony and reviewing the evidence concerning Plaintiffs' counsel's services and charges, it is clear to the Court that Plaintiffs' counsel's efforts were necessary and reasonable under the circumstances.

The United States Supreme Court recently held that:

the text of [Section] 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that "any debt ... for money, property, services, or ... credit, to the extent obtained by" fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.

*Cohen v. De La Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 1219, 140 L.Ed.2d 341 (1998). Plaintiffs' need to retain counsel to defend their homes, and the fees and costs incurred as a result, were the natural and proximate consequence of the fraudulent conduct of Smith. Plaintiffs could not sit idly by hoping that the liens would be paid either by title insurance companies or by Smith. They were required to defend the foreclosure actions. Had they failed to do so, their mortgage lender could have objected to the existence of the pending liens and declared Plaintiffs in default on their home loans. See Exhibit 186, p. 5, ¶ 2. Therefore, Plaintiffs' attorney fees and costs are included in the damages excepted from discharge under Section 523(a)(2)(A).

Plaintiffs' counsel prepared detailed summaries and billings related to defending against the liens and the state court litigation, and separated out those fees and costs incurred for this adversary proceeding. The Court has reviewed the billings and finds that all fees and costs, save two charges of $84.00 each on Bells' July 31, 1998 billing in the Glenn Electric suit, were reasonable and necessary in defending Plaintiffs in the foreclosure actions. The two disallowed charges, at least in part, related to the dischargeability proceedings as the service description indicates. *See* Plaintiffs' Exhibit 181: July 31, 1998 Invoice. Interest charges have also been excluded since these did not naturally flow from Smith's conduct but rather were a result of Plaintiffs taking advantage of

available credit. The total amount of Plaintiffs' attorney fees and costs which should be included in the nondischargeable debt is $6,722.85 with respect to Bells, and $5,664.20 with respect to Pacheco, for a total of $12,387.05.

## IV. Conclusion

Plaintiffs have satisfied their burden of proof and established the requirements necessary under Section 523(a)(2)(A) to support a finding by this Court that debts arising from claims of liens against Plaintiffs' homes in the amount of $22,713.45 (Bells) and $15,009.79 (Pacheco), as well as Plaintiffs' attorney fees and costs incurred in defending against those liens in the amount of $6,722.85 (Bells) and $5,664.20 (Pacheco), should be excepted from Debtor's discharge. Counsel for Plaintiffs shall submit an appropriate form of judgment to be entered by the Court in accordance with this decision.